(No. 12913.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ALEX MARX *et al.* Plaintiffs in Error.

*Opinion filed December 17, 1919—Rehearing denied Feb. 4, 1920.*

1. CRIMINAL LAW—*the weight of conflicting evidence is for the jury.* Where the testimony is conflicting it is for the jury to pass on the credibility of witnesses and the weight of the evidence, and the Supreme Court will not disturb the verdict on the facts alone, unless it is palpably contrary to the weight of the evidence.

2. SAME—*evidence as to why prosecutrix employed an attorney is not admissible.* In a prosecution for rape, where it appears that the prosecutrix had employed an attorney, it is proper for the court to refuse to allow the prosecutrix to be cross-examined as to the purpose for which she employed the attorney.

3. SAME—*when on-lookers are accessories to the crime of rape.* Where five young men are charged with the crime of rape committed in an automobile while taking a woman from a cabaret to her hotel, the driver of the car and his brother, who sat on the front seat, may be convicted as accessories though they took no active part in the rape, where it appears the driver drove several miles out of his way in going to the hotel and his brother testified that he suspected the other men were having intercourse with the woman but supposed it was with her consent.

4. SAME—*under the Parole act of 1917 defendants under twenty years of age may be sentenced to penitentiary for rape.* Under the Parole act of 1917 (Hurd's Stat. 1917, p. 1042,) defendants under twenty years of age who are convicted of the crime of rape may be sentenced to the penitentiary.

5. SAME—*hotel clerk may testify that prosecutrix made complaint to him.* In a prosecution for rape, the clerk of the hotel where the prosecutrix was living may testify as to the disordered appearance and nervous condition of the woman when she came into the hotel at half-past two o'clock in the morning and that after questioning her she made a statement as to the crime, where he does not testify as to the details of such statement.

6. SAME—*what remark by the assistant State's attorney is not prejudicial.* Where the assistant State's attorney in addressing the jury, after calling attention to a statement he had made to the jurors when examining them, to the effect that they should not assume any responsibility not given to them, says, "Don't assume any power of the Governor as to executive clemency or parole," such remark is not prejudicial error.

7. SAME—*when refusal to give instructions is not ground for reversal.* Where the abstract does not show that the instructions shown therein to be given were the only ones given it will not be presumed that the jury were not instructed on points contained in instructions which were refused, and the refusal to give said instructions is not, in such case, ground for reversal.

8. SAME—*when refusal to delay hearing of motion for new trial is not prejudicial error.* A refusal to delay the hearing of a motion for new trial is not prejudicial error where the record does not show any error committed on the trial of the case which would justify a reversal of the judgment.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. M. HENRY GUERIN, Judge, presiding.

DANIEL L. MADDEN, and ROY C. MERRICK, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, and DANIEL G. RAMSAY, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

Plaintiffs in error were found guilty in the criminal court of Cook county of the crime of rape and each sentenced to a term of five years in the penitentiary. This writ of error has been sued out to review the record of the criminal court.

Rosette Arnold, also known as Virginia LaVerne, was a young woman about twenty-three years of age, who resided at the Calvert Hotel, at Wabash avenue and Eighteenth street, in Chicago. She made her living partially by singing. On the evening of May 3, 1919, she was substituting for another singer in a cabaret conducted by one Tancl, at Ashland and Blue Island avenues, in Chicago. On that same evening the five plaintiffs in error and another young man called "Skippo," whose real name appears to have been Joe Petkus, were driving in an automobile around the city, visiting various saloons and cabarets on the

west side. The car belonged to the father of Peter Marx.
It was driven by Alex Marx, a foster-brother of Peter, who
had worked for the elder Marx as a chauffeur for sev-
eral years. Peter was aged twenty and Alex twenty-two.
George Haley was twenty-three years old and worked for
one of the large dry goods stores, as did Petkus. John
Haley was twenty and worked for a newspaper, and Robert
Duffy was twenty-two and worked for a teaming company.
Alex Marx, George Haley and Duffy had all been in the
army during the late war. Apparently the two Marx boys
had started out that evening with the car without any pre-
conceived plan of where they were going or whom they were
to take with them and had taken in the others as acquaint-
ances on their way. The complaining witness, Rosette Ar-
nold, testified that she had danced with Petkus at Tancl's
cabaret and had talked with the other young men; that one
of them had invited her to ride home in the automobile,
and, on account of the long wait necessary if she took the
street car, she consented; that after they had gone a short
distance in the automobile she was attacked, and Petkus,
the two Haley boys and Duffy all had sexual intercourse
with her forcibly and against her will, on the back seat
of the car; that she struggled and cried but they assisted
each other in holding her, and when she tried to cry out
they put their hands over her mouth; that they rode around
the streets of the city for an hour and a half or two hours,
leaving the cabaret shortly after one o'clock and arriving
at her hotel at 2:30 in the morning; that when she got to
her hotel her underclothes had blood on them, her hair
was all down, her face was black and blue and her arms
and limbs bruised. She further testified that when she got
out of the car in front of the hotel they threw out after her
the grip which contained her costume, but that she missed
her pocket-book and cried after them, "Give me my pocket-
book, please," but they refused with an oath and drove on
and that she never got it back. She further testified that

at the time of the trial she was suffering from gonorrhea or an enlarged gland, which she had been free from at the time of the occurrence, and that she had never had any sexual intercourse with any person except that forced upon her on this occasion. The clerk of the Calvert Hotel testified that Miss Arnold came into the hotel at about 2:30 on the morning of May 3 and was hysterical and crying and that her face was swollen; that he asked her what was the matter and it took quite a while to get a statement out of her; that he then called the hotel doctor, and Miss Arnold went to her room and was examined by Dr. Weinlander, the physician in question. This physician testified that he was called about 2:45 that morning and found complaining witness very nervous; that her cheek and lip were bruised and her face swollen, and that there were some bruises on her leg and thigh as well as a slight laceration of her private parts and some blood-stains on her clothes; that about a month later he examined her and found she had an infection of the glands of her private parts, the nature of which he could not state with certainty. The policeman who arrested the five plaintiffs in error and who was in charge of investigating the occurrence, testified that when these young men were in the station, after their arrest, they were identified by the complaining witness and charged by her with committing the offense, and that neither of them said anything in reply .

The five plaintiffs in error took the stand in their own behalf. Peter Marx testified that when they started from Tancl's he sat in one of the small chair seats in the middle of the car and Duffy in the other; that Skippo and George Haley sat in the back seat with Miss Arnold, and witness' brother, Alex, and John Haley, were in the front seat; that he was dozing and sleepy and did not hear anyone scream or any fighting in the car and did not see any act of sexual intercourse or take part in anything of the sort; that shortly after they started the ride in the automobile, as John Haley

wore no overcoat, witness changed seats with him and sat in the front seat with his foster-brother, the chauffeur. The complaining witness testified that Peter, before he moved to the front seat, put his hand on her breast and that she objected and moved it away. He testified that after he moved into the front seat he did not notice particularly what was going on in the back seat but suspicioned that the young men were having sexual intercourse with the complaining witness and without any objection on her part. Alex Marx testified that he drove the car; that he did not know that Miss Arnold was in it until he arrived at Eighteenth and Throop streets; that he did not hear any outcry or fighting or wrestling in the back of the car and did not take part in any way in having sexual intercourse with anyone or know that there was anything of that nature going on. George Haley testified that when they were sitting at the table at Tancl's cabaret Miss Arnold came over and asked them if they did not know that that was her table, and they then invited her to sit down, and afterward Petkus danced with her and later suggested that they take the girl home; that Petkus and he and his brother, John, and Duffy, each had intercourse with her in the order named, on the back seat of the car, while they were driving along; that she did not resist him and nobody held her or offered any violence to her to get her to consent to such intercourse; that when she got out of the car she said, "Don't say anything at Tancl's about the trip." John Haley testified that the four young men just mentioned had sexual intercourse with Miss Arnold, Petkus being the first, and that before that time Petkus had been hugging and kissing her; that it was perfectly agreeable to Miss Arnold and no one forced her in any way; that after his brother got through with the sexual intercourse witness was to have the next turn, and Miss Arnold asked him to wait a few minutes so she could rest, and that while she was waiting she kept her dress partly up. This witness also testified that she asked him

not to let her employer know about the matter. Duffy also testified that Miss Arnold asked him to wait a short time and that he then had intercourse with her consent, she waiting for him with her dress up while she rested, and that afterward she asked them not to tell at Tancl's about her being out with them. Miss Arnold herself testified that when she got out of the car she told the young men not to tell what had happened, because she was ashamed and did not want anyone to know about it. The man called Skippo or Petkus does not seem to have been arrested and was not tried with plaintiffs in error.

The testimony is all to the effect that Skippo, the two Haleys and Duffy all had sexual intercourse with Miss Arnold on the back seat of the automobile as they drove from Tancl's cabaret to the Calvert Hotel, through the streets of Chicago. The evidence also shows that they drove several miles out of their way in going between the cabaret and the hotel in the early morning hours of May 3. The testimony of the complaining witness, as well as that of the plaintiffs in error, agrees substantially that the car was running at a moderate rate,—about fifteen miles an hour. The complaining witness testified that they went through some streets that were rather dark; that the top of the car was up and that everything inside of the car would be somewhat dark, even if the streets were lighted.

Counsel for plaintiffs in error argue with great earnestness that the evidence was not sufficient to justify the verdict; that the testimony of the complainant is not corroborated by the facts or circumstances otherwise proven on the trial; that the automobile did not drive through dark country roads or deserted localities but through a populously settled portion of Chicago, where a woman's screams, if made, would quickly bring assistance, and that the young woman showed by her own testimony as to asking for her pocketbook after she left the car that she was not as greatly excited or moved as she naturally would have been if her tes-

timony were true and if the acts were committed upon her forcibly. We cannot concur in the conclusions as to the evidence reached by counsel for plaintiffs in error. This question was peculiarly one for the jury. They saw and heard the story of the complaining witness and the other witnesses, including the plaintiffs in error, and were in a much better position to judge of the truth or falsity of the testimony than is this court. We do not think it is at all unreasonable to believe that even if this young woman had cried out when she could, although not gagged or her mouth stopped all the time the acts were being committed, she would not have been heard from the moving automobile in the early hours of the morning in such a way that passers-by might have interfered. We do not think the argument that she is uncorroborated is based on the record. Her testimony as to her condition when she reached the hotel is fully corroborated by the clerk, the doctor who examined her and the policeman who came shortly thereafter. The fact that her clothing was not more badly torn or disturbed than it was does not, in our judgment, tend to contradict her story. With four or five vigorous young men holding her, it can be readily seen that her clothing might not be as much torn or disturbed as if she had only been attacked by one man. The fact that three of these young men had served in the army in the recent great world's war and had been honorably discharged, and that all five plaintiffs in error had previously borne good reputations, was before the jury for their consideration. The fact that three of these young men admit that they had sexual intercourse with the complaining witness, even though she consented, under the circumstances shown by this record, would tend to show that they were not of the highest moral character and standing. Where there is a conflict of evidence, as there is in this case, it is the peculiar province of the jury to pass upon the credibility of witnesses and the weight of the evidence, and the court will not disturb the verdict of the jury un-

less such verdict is palpably contrary to the weight of the evidence and the defendant has not been proved guilty beyond a reasonable doubt. (*Henry* v. *People,* 198 Ill. 162; *People* v. *Bond,* 281 id. 490; *People* v. *Foster,* 288 id. 371.) The testimony on all the conflicting matters was before the jury, and the question whether plaintiffs in error or the complaining witness told the truth was primarily one for the jury to pass on. We cannot say that the evidence does not support the verdict.

Counsel for plaintiffs in error argue that the examination of the complaining witness was unduly limited by the trial judge. It appears from the briefs and certain questions asked of the prosecutrix that she had engaged the services, for some purpose, of attorney Louis Grollman, and counsel argue that they were trying to show by her examination that she had engaged him to settle with plaintiffs in error for their acts towards her by money damages, and that this might throw light on the credibility of her testimony. Of course, the complaining witness had a right to settle with the plaintiffs in error for the injury done her, and she might have maintained a civil suit. This being so, the trial court did not err in excluding her examination as to what attorney Grollman had been engaged to do for her with reference to such settlement. *People* v. *Cassidy,* 283 Ill. 398.

Counsel for plaintiffs in error argue most strenuously that the Marx brothers were not guilty of the crime of rape as it is not claimed that either of them had sexual intercourse with the prosecutrix or took any active part in holding her while the others did have such intercourse; that the aiding, abetting or assisting in a crime, under the authorities in this State, is different from consenting to a crime; that the acts of aiding, abetting or assisting are affirmative in their character, and that consenting may be a mere negative acquiescence, not in any way made known at the time to the principal malefactor; that such consenting, although

it involves moral turpitude, does not make the person an accessory under the statute. (*White* v. *People*, 81 Ill. 333; *White* v. *People*, 139 id. 143.) Without question, to constitute a person guilty of a crime as principal there must be presence or participancy, or the doing of some act, at the time of the commission of the crime, in furtherance of the common design. A person who encourages the commission of an unlawful act cannot escape responsibility by quietly withdrawing from the scene. It is not necessary that he should do some act at the time to constitute him a principal, but he must encourage its commission by acts or gestures, either before or at the time of the commission of the offense, with full knowledge of the intent of the persons who commit the offense. (1 R. C. L. 139, and authorities there cited.) It cannot be contended, of course, that mere presence at the commission of a criminal act renders a person liable as a participator therein. If he is only a spectator, innocent of any unlawful intent and does no act to countenance or approve the acts of those who are actors, he is not criminally responsible because he happens to be a looker-on and does not use active endeavors to prevent the commission of the unlawful acts. "Notwithstanding these rules as to the non-liability of a passive spectator, it is certain that proof that a person is present at the commission of a crime without disapproving or opposing it, is evidence from which, in connection with other circumstances, it is competent for the jury to infer that he assented thereto, leant to it his countenance and approval and was thereby aiding and abetting the same." (1 R. C. L. 141, and authorities there cited.) It is clear that the plaintiff in error Alex Marx, who was driving the automobile, did not in any way take part actively in the holding of the prosecutrix at the time when she charges the acts were being forcibly committed, but the evidence shows without contradiction, and he himself admits, that he drove the car several miles out of the way in Chicago while going from the cabaret

to the hotel at Wabash avenue and Eighteenth street. His acts in this regard tend to show that he was actually encouraging and approving what was being done in the car. We think, under the authorities and the testimony in this regard, the jury were justified in finding that his foster-brother, Peter Marx, was assenting and by his actions approving, thereby aiding and abetting in the commission of the offense, as he himself said that he suspected what was going on in the rear of the car, and while he denies the act the prosecutrix testified that he put one of his hands upon her breast at some time while they were in the car.

Counsel further argue that John Haley and Peter Marx, being under the age of twenty years, should have been sentenced to the reformatory for an indeterminate term, as decided in *People* v. *Rardin,* 255 Ill. 9. That case was decided by this court in 1912. The Parole act was amended by the legislature of this State in 1917 as to this crime, and under the wording of the first four sections of said act as enacted in 1917, in force at the time of this crime, (Hurd's Stat. 1917, p. 1042,) the plaintiffs in error John Haley and Peter Marx were rightly sentenced to the penitentiary for the crime of rape.

It is further argued that the complaint of the prosecutrix to the hotel clerk was improperly admitted in evidence. The clerk in his testimony described the condition of the prosecutrix at the time she came into the place, and stated that she, after talking with him, did make complaint, but the objection to the question by the assistant State's attorney as to what complaint she made was sustained by the court and the clerk did not testify as to the details of the complaint. Under the authorities there was no error committed by admitting what the hotel clerk testified to. 22 R. C. L. 1217; *State* v. *Griffin,* 43 Wash. 591; 11 Ann. Cas. 95, and authorities cited in note.

It is further urged by counsel for plaintiffs in error that the assistant State's attorney made improper remarks in his

291 — 4

address to the jury. They object to the statement of the assistant State's attorney as follows: "When I talked to you in your examination on the *voir dire* I asked you not to assume any responsibility not given to you. Don't assume any power of the Governor as to executive clemency or parole." Counsel argue that under the reasoning of this court in *Farrell* v. *People,* 133 Ill. 244, it was error to so argue. In the case just referred to it was held that it was error for the State's attorney to call the attention of the jury to what was generally known as the "good time" statute and insist that they should take that into consideration in fixing the term of imprisonment. The argument of the assistant State's attorney in this case did not tell the jury that the Governor had a right to parole and therefore they ought to convict. It was merely a reference to some questions that had been asked the jurors when they were being examined as to their qualifications, and we do not see how plaintiffs in error were injured by this reference.

Certain objections were also made by counsel to the instructions given and refused in the trial court. It is urged that the court erred in failing to give two instructions that were asked for plaintiffs in error which referred to the question of the guilt of the accused if the prosecutrix had consented to the sexual intercourse. An instruction was given by the court at the request of plaintiffs in error which stated in positive language that to authorize a conviction for the crime in question the jury must believe from the evidence, beyond a reasonable doubt, that one or more of the defendants had carnal knowledge of the prosecuting witness forcibly and against her will and "that she did not yield her consent during the act." The chief difference between this instruction given and the two instructions refused is that the refused instructions were long and complicated and full of seemingly contradictory terms, and one of the refused instructions, in part, was not based on the evidence.

There is another reason why the refusal to give these instructions cannot be held to be reversible error. The abstract nowhere shows that the instructions given were the only ones given, and this court has held that it will not presume that there were no instructions given covering the point raised by counsel for plaintiffs in error. *Thompson* v. *People,* 192 Ill. 79; *Reavely* v. *Harris,* 239 id. 526.

Counsel for plaintiffs in error further argue that the court overruled the motion for new trial after it was made, without giving them an opportunity to be heard thereon, and that under the reasoning of this court in *White* v. *People,* 90 Ill. 117, *Neathery* v. *People,* 227 id. 110, and *People* v. *Ambach,* 247 id. 451, this was error. Nine witnesses testified in this case,—four on behalf of the State and the five plaintiffs in error for the accused. Moreover, the record does not show that counsel for plaintiffs in error told the court that they wanted to argue the motion for a new trial at the time it was made, but they stated they were not prepared at that time and wanted to put it off to some future day so they might adequately prepare. Having found in this opinion that no reversible error was committed on the trial of the case, we do not see how plaintiffs in error could have been injured by the refusal of the trial court to permit the decision of the motion for new trial to be delayed so that counsel for plaintiffs in error could adequately and properly present their suggestions on such motion. We do not think, in view of the record in this case, that the court committed reversible error in refusing to delay the hearing on the motion for a new trial.

The judgment of the criminal court of Cook county will therefore be affirmed.

*Judgment affirmed.*