# Richmond

## GLEN D. BLEVINS v. COMMONWEALTH OF VIRGINIA.

March 10, 1969.

Record No. 6907.

Present, All the Justices.

*Roy A. Swayze* (*Swayze, Cowles & Tydings*, on brief), for plaintiff in error.

*W. Luke Witt, Assistant Attorney General* (*Robert Y. Button, Attorney General*, on brief), for defendant in error.

SNEAD, J., delivered the opinion of the court.

Glen D. Blevins, defendant, was tried on an indictment charging him with the murder of Greer F. Holyfield. The jury found Blevins

guilty of murder in the second degree and fixed his punishment at confinement in the State Penitentiary for a period of twenty years. Motions for a mistrial and a new trial and to set aside the verdict were overruled. By judgment order entered July 28, 1967, the defendant was sentenced in accordance with the jury verdict. A writ of error was awarded him to that judgment.

The basic issues raised by the assignments of error relied upon are whether the trial court erred (1) in overruling defendant's motions to strike the Commonwealth's evidence; (2) in amending Instruction B.; and (3) in giving the amended instruction after summary argument by counsel and after the jury had retired to consider a verdict, "without granting defendant a new trial".

The evidence may be summarized as follows: At about 8 p.m. on September 23, 1966, the defendant, Glen D. Blevins, age 19, met Belvin Penny and Wayne Jannel at a store in Fairfax county. They proceeded to Fairfax where they drank some wine and then went to a party where they drank more wine and danced. Blevins, Penny and Roger Watson left the party at approximately 10 p.m. and obtained a station wagon owned by Blevins' father. They drove to a nearby bowling alley where they met John Monroe and Rudolphus Gadd, who had also been drinking. The five boys, who were approximately the same age, then left in Blevins' car and purchased a case of beer which they proceeded to drink. Their next stop was at "Top's Drive In" at Fairfax Circle. From there they went to a dance hall called "Social Circle". Blevins became engaged in an argument there so the five boys departed and commenced riding around on back roads in the county. Blevins was driving and all of them were intoxicated. They decided to fell a tree across a road "just for fun" so they drove to Watson's home and got an ax. Upon reflection, they abandoned the idea because they thought they "might get in trouble". They chopped mailboxes[1] and a subdivision sign instead. Blevins, intoxicated and unable to control the car properly, also ran into mailboxes on the side of the road.

At about 1:45 a.m. on September 24, the boys stopped in front of the residence of Greer F. Holyfield on Kincheloe road (Route 612) and one or more of them chopped his mailbox with Watson's ax. Mrs. Greer F. Holyfield was awakened by a "banging noise" which she interpreted to be "somebody changing a tire". The noise woke her husband who was caretaker of a Fairfax county park. He dressed

---

[1] 18 U.S.C.A. § 1705 makes it a felony to wilfully or maliciously destroy, tear down or deface any mailbox.

in his caretaker's uniform, went out on the porch and fired his .22 calibre automatic rifle. He then went back into the house as the car at his mailbox drove off. Mrs. Holyfield, who was watching from an upstairs window, informed Holyfield of the direction in which the car left and he took his rifle and pursued the vehicle in his own automobile. A "couple of minutes" later Mrs. Holyfield heard another shot.

Blevins and his companions stopped a short distance down the road at the entrance to a lane leading to the house of Norman Longerbeam. According to some of the boys, they stopped to "urinate". However, expert testimony revealed that Longerbeam's mailbox was chopped by the ax the boys had in their possession. Just as the boys got back into their vehicle, Holyfield drove up and stopped about 20 feet behind them with his headlights shining on the rear of Blevins' station wagon. Holyfield, who was 48 years old, 64 inches tall and weighed 150 pounds, approached the Blevins vehicle and at gunpoint ordered all of the boys out of it. All but John Monroe quickly complied and went back to the lighted area between the two cars as directed. Monroe had difficulty getting out of the right rear door so Holyfield went there and his rifle discharged. Monroe began to struggle with Holyfield and then Blevins and Penny joined the scuffle. Watson ran into the woods and Gadd ran up the road.

Watson testified: "I heard the fighting and I could tell there was scuffling up there and then I could hear, 'I have had enough,' by the man because I knew their voices." Watson said he went back to the car and as he was entering it Blevins and Penny were "just getting in the front seat". He testified that at that time Blevins stated: "'We beat the hell out of him'". Monroe remained between the two vehicles with Holyfield. Blevins, Penny and Watson said they heard scuffling noises coming from that area.

About a minute later Gadd returned to the scene, "* * * walked down beside the car and went back there and then John [Monroe] came inside [the car] and the sounds became more intense". The boys in the vehicle heard moaning sounds while Gadd was back of the car with Holyfield, and Blevins testified that he heard heavy blows. Gadd was at the scene about "a minute or so". He then got into Holyfield's automobile alone and drove past the Blevins car and down the road. With Watson driving, the other four boys followed in the Blevins automobile. After having traveled about three-quarters of a mile Gadd drove into a ditch. The record before us

does not show the cause, but the Holyfield vehicle thereafter caught fire and burned. Gadd then rejoined his companions in the station wagon which had stopped to pick him up and told them that he "killed the man". According to Penny, Monroe stated: " 'I tore the man's eyeballs out' ". After proceeding a short distance, the Blevins car ran out of gasoline near the home of Jerome Johnson. Blevins, who was acquainted with Johnson, woke him about 3 a.m. and made an unsuccessful attempt to obtain assistance. Johnson observed blood on Blevins' clothing and testified that Blevins stated that at a party "some guy got after him with a rifle" and he took the rifle and struck him with it.

In the meantime a report had been received by the Clifton Fire Department that an automobile (Holyfield's) containing occupants was on fire. An ambulance was dispatched to the scene. After determining there were no occupants in the burning vehicle and after police officers and the fire truck had arrived Emmett Barrett, the driver of the ambulance, and another fireman who accompanied him proceeded to return to the fire station. On the way they discovered the dead body of Holyfield in the ditch near Longerbeam's mailbox, and in response to their call the police arrived to investigate. A rifle which had been broken into pieces was found near the body.

Sergeant Blamer, a member of the Fairfax County Police Department, observed Blevins and Watson in a lighted telephone booth about 4 a.m. He noticed blood on Blevins' hands and clothing. Upon inquiry, Blevins informed Blamer that he had been involved in a fight. He agreed to accompany Blamer to the scene where Holyfield was murdered. There he made no statement other than to reiterate that the blood on him was the result of "a fight with somebody in a dark car on Ruby Drive". Blevins readily surrendered his blood stained clothing for a chemical analysis. The next day he was arrested for the murder of Holyfield.

Dr. Claude E. Cooper, Fairfax County Medical Examiner, testified as to the results of the autopsy performed on Holyfield. He said: "The prime, the immediate cause of death was multiple lacerations or tearing of the brain, secondary to many compound comminuted fractures of the skull. In other words, the skull was crushed in many pieces and then as a result of the forcing blows, the brain had several lacerations down it which were incompatible with life." In addition, he stated that Holyfield received a fractured nose and other lacerations below the head caused, in his opinion, by a blunt instrument, and that a fractured nose would cause bleeding but not death.

Monroe and Gadd were called as witnesses on behalf of the defendant, but they refused to testify on the ground that such testimony might tend to incriminate them.

Blevins, the defendant, testified, among other things, that he and Penny joined in the scuffle between Monroe and Holyfield; that he took the rifle from Holyfield, threw it on the ground and "went back to fight the man because he was trying to fight back to get the gun, apparently", and that during the struggle Holyfield fell down and received a bloody nose. He denied striking Holyfield with the rifle, but said that he "might have" knocked him down. Blevins admitted that the blood on his hands and clothing was Holyfield's blood. He further testified that he did not remember telling Watson "We sure beat the hell out of him", and that when he left Monroe fighting Holyfield and took a seat in his vehicle along with Penny and Watson he did not recall anything being said.

At the conclusion of the Commonwealth's evidence and again at the conclusion of all the evidence defendant made motions to strike the Commonwealth's evidence, which were overruled. The defendant contends that the evidence was insufficient, as a matter of law, to support a conviction of murder, and that it was error to overrule his motions to strike.

"* * * Where the perpetration of a felony has been entered on, one who had aided and encouraged its commission may nevertheless, before its completion, withdraw all his aid and encouragement and escape criminal liability for the completed felony; but his withdrawal must be evidenced by acts or words showing to his confederates that he disapproves or opposes the contemplated crime. Moreover, it is essential that he withdraw in due time, that the one seeking to avoid liability do everything practicable to detach himself from the criminal enterprise and to prevent the consummation of the crime, and that, if committed, it be imputable to some independent cause." 22 C.J.S., Criminal Law, § 89, pp. 267, 268.

In *People* v. *Nichols*, 230 N.Y. 221, 222, 129 N.E. 883, 885, it was said:

"Whatever may be the other requirements of an effective abandonment of a criminal enterprise, it is certain both as a matter of law and of common sense that there must be some appreciable interval between the alleged abandonment and the act from responsibility for which escape is sought. It must be possible for a jury to say that the accused had wholly and effectively detached himself from

the criminal enterprise before the act with which he is charged is in the process of consummation or has become so inevitable that it cannot reasonably be stayed. The process of detachment must be such as to show, not only a determination upon the part of the accused to go no farther, but also such as to give his coconspirators a reasonable opportunity, if they desire, to follow his example and refrain from further action before the act in question is committed." See also *People* v. *Lacey*, 49 Ill. App.2d 301, 307, 200 N.E.2d 11, 14.

■ Tested by these principles, the evidence adduced was sufficient to sustain the jury verdict. The jury could have found that Blevins did not effectively abandon the conflict. The trial court was correct in overruling defendant's motions to strike.

Counsel for defendant submitted Instruction B. relating to abandonment which was granted. It reads:

"The Court instructs the jury that if it believes from all the evidence that Glen D. Blevins, John Monroe or Belvin Penny struck the deceased and threw him to the ground, and that resulting injuries to the deceased were not sufficient to cause his death, and further believe that Blevins abandoned further conflict, and thereafter someone else, other than the defendant, inflicted the wounds which caused the death of Greer F. Holyfield, and that the defendant *did not* by concert of action with such other person or persons or by aiding or abetting them, as defined in other instructions, then the jury cannot find the defendant guilty in this case." (Italics supplied.)

The main thrust of the argument of counsel for defendant to the jury was that when Blevins returned to and sat in his car he effectively abandoned the conflict and was not thereafter acting in concert with either Monroe or Gadd in the commission of their crimes.

After deliberating for sometime the jury returned to the courtroom. The foreman stated to the court that Instructions B. and No. 13.[2] appeared to some of the jurors to be in conflict and requested clarification. After hearing argument by counsel, out of the presence of the jury, the court over the objection and exception of counsel for defendant amended Instruction B. by substituting the words "had not acted" for the italicized words "did not", *supra*, making the latter part of the instruction read: "* * * and that the defendant

[2] "The Court instructs the jury that if there is concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and bound by acts of every other person connected with consummation of such resulting crime."

had not acted by concert of action with such other person or persons or by aiding or abetting them * * *".

As a result of the amendment, counsel for defendant moved for a mistrial, which was not granted. He did not ask for an opportunity to make additional argument to the jury. The trial court read amended Instruction B. to the jurors, delivered it to the foreman, and told them that they must decide the case on the evidence and the instructions given by the court. After further deliberation the jury returned a verdict of guilty.

Counsel for defendant points out that Blevins' entire defense to the case was abandonment. He argues that when the court altered the instruction after the jury's inquiry by changing the word "did" to "had" and by inserting the word "acted", the net effect was to deprive him of his defense. He concedes that Blevins was acting in concert with Monroe and Penny when they were scuffling together with Holyfield. But he denies there was any concert of action between Blevins, Monroe and Gadd after Blevins took a seat in his car. He says that the amended instruction was an incorrect statement of the law in that it told the jury "that once it appeared that defendant had acted in concert with the others, it was then too late to abandon the conflict and he is to be held responsible for all ensuing acts of the others". We do not agree with that interpretation.

Instruction B. as tendered was not skillfully drawn. The amendment made to it was an improvement. But we think the wording could be further improved upon, and we do not adopt it as a model instruction on the law of abandonment. However, when the amended instruction is carefully considered it does not deny the defense of abandonment to Blevins as he contends. The phrase "had not acted by concert of action" refers to "such other person" when that other person administered the fatal blows, and it carries no implication, as Blevins argues, that the concert of action could be "at any time."

Under the amended instruction the jury could have found that Blevins initially acted in concert with Penny and Monroe but effectively abandoned the conflict and thereafter did not act in concert with either Monroe or Gadd when the homicide was committed. We hold that the trial court did not err in amending Instruction B.

■ The trial court not only has the right but it has a duty to amend instructions which appear to be erroneous or misleading after summation by counsel and after the jury has retired to consider a ver-

dict. In the case at bar the mere fact that Instruction B. was amended at such time did not constitute grounds for a mistrial and the awarding of a new trial. Hence, we hold this error assigned is without merit.

The judgment appealed from is

*Affirmed.*