140 N.J. Super. 429 (1976)
356 A.2d 433
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
STEVEN THOMAS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 18, 1976.
Decided March 19, 1976.
*432 Before Judges MATTHEWS, LORA and MORGAN.
*433 Mr. James E. Flynn, designated counsel, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Mart Vaarsi, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Ms. Barbara Ann Villano, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by MORGAN, J.A.D.
Convicted by jury verdict of murder in the first degree, defendant appeals contending that (1) his motion for a foreign jury was improperly denied; (2) his statement was erroneously admitted into evidence; (3) the trial court improperly refused to permit jury consideration of the voluntariness of his statement; (4) the trial judge erred in allowing cross-examination into the collateral issue of defendant's employment, and (5) a mistrial should have been granted on the ground of prosecutorial misconduct regarding defendant's prior conviction. Particular emphasis is given to asserted errors in the court's charge, supplemental charges in response to jury questions, and refusal to charge as requested concerning presence at the scene of the crime. Finally, defendant contends that the trial judge erroneously refused to grant a post-trial examination of the jurors following a telephone call from one of them regarding possible misunderstanding of the law governing the case.
During the early evening hours of September 12, 1973 one Frank Jennette shot and killed Officer Casper Buonocore from the rooftop of 49 Armstrong Avenue in Jersey City. It was at all times undisputed that Buonocore was in uniform and in the performance of his duties when he was killed. The events which terminated in this tragic occurrence commenced innocently with the ticketing of a double-parked car in the area of the crime. The driver of the vehicle, one Sam Williams, was arrested when a radio check revealed an outstanding motor vehicle warrant for him. *434 Williams' daughter, 13 years of age, intervened in an apparrent attempt to prevent her father's arrest and struck one of the arresting officers. When the patrol car arrived to transport Williams to the police station, the daughter was also placed under arrest for assault. When she renewed her attack she was struck by another officer and rendered unconscious. Officer Buonocore, who had neither arrested the father nor struck the daughter, summoned an ambulance and rendered first aid to the girl. Eventually, the father was transported to the police station and the daughter removed in the ambulance. Buonocore and his partner were then instructed to resume their normal patrol duties and were departing the scene on their motorcycles when Buonocore was felled by the fatal shot.
Defendant and two other young men, Frank Jennette and David Cheatham, were arrested in the neighboring building and taken to the Fifth Precinct. The State conceded that Jennette had fired the fatal shot; later he pleaded guilty to the charge. Cheatham and defendant were charged as aiders and abettors. Defendant's conviction rested largely on some inculpatory matter in his own statement. In it he admitted both seeing Jennette with the gun earlier in the evening while with him in a neighborhood bar and, after the incident in which the young girl was rendered unconscious, responding to Jennette's invitation to go up on the roof "to shoot the police." When asked why he went up on the roof with Jennette defendant responded that he did not know. Notwithstanding, defendant asserted in the statement that he was not on the roof with Jennette and Cheatham at the time the shot was fired. At trial defendant denied the truth of the inculpatory portions of his statement, contending that he did not see Jennette's gun until they were on the roof, was unaware of Jennette's intention to shoot a police officer, and that as soon as he became aware of that intention he fled the roof.
The State adduced no direct evidence that defendant was on the roof at the time the fatal shot was fired. It argues *435 that his presence there as an aider and abettor of the murder was reasonably inferable from the fact of his friendship with Jennette, knowledge of Jennette's intentions to "shoot the police" and the latter's possession of a gun with which to achieve this purpose, together with his admission that with such knowledge he accompanied Jennette to the roof. Accordingly, the State properly contends, the jury was entitled to disbelieve that portion of defendant's statement and testimony that he left the roof before the actual shooting occurred.

I
We deal first with defendant's several claims of prejudicial error concerning the charge. Its essential design was to inform the jury of principles applicable to two alternative findings of fact: one, that the victim when killed was a police officer in the performance of his duties, and the other, that he was not. Hence, the trial judge first explained the concept of murder in its two degrees of culpability, the presumed conclusion of murder in the second degree, and the enhanced culpability, designated murder in the first degree, on a finding of design and premeditation. The appropriate statutes were read to the jury. These principles, explained the judge, were applicable in the event the jury concluded that Buonocore was not a police officer in the performance of his duties when killed. Although the accuracy of the explanation itself is not impugned, the necessity and propriety of the instruction was the subject of a defense objection after the conclusion of the charge.
The trial judge next informed the jury of the principles applicable in the event they found that Buonocore was a police officer in the performance of his duties. They were told that a verdict of first degree murder required a finding of an intent to kill; a finding of premeditation and design was unnecessary. If the intent was not to kill, but to inflict any harm, no matter how grievous, the proper verdict for *436 murder of a police officer would be second degree murder. State v. Madden, 61 N.J. 377 (1972).
Since defendant was charged with being an aider and abettor, the judge properly instructed the jury as to the principles applicable to determining defendant's status as such. N.J.S.A. 2A:85-14. They were advised that the degree of an aider and abettor's culpability must be determined with respect to that person's own intent, again in accord with State v. Madden, supra, and referred the jury back to the portion of the charge dealing with the quality of intent essential to the degree of murder being considered. The evidential impact of presence at the scene of the murder, if found, was explained in the following terms:
In addition, while mere presence at the scene of the perpetration of a crime does not render a person a participant in it, proof that one is present at the scene of the commission of a crime without disapproving or opposing it is evidence from which, in connection with other circumstances, it is competent for you members of the jury to infer that he assented thereto, lent to it his countenance and approval and was thereby aiding and abetting same. It depends upon the totality of the circumstances as those circumstances appear from the evidence.
The judge advised the jury that if the actual perpetrator of the murder was armed in its commission, then defendant could be held for murder while armed, if found to be an aider and abettor.
Finally, the judge advised the jury of the five possible verdicts which could be returned: (1) acquittal, (2) murder in the first degree while armed, (3) murder in the first degree while not armed, (4) murder in the second degree while armed, and (5) murder in the second degree while not armed. The judge properly chose not to charge manslaughter. No verdict form was given to the jury.
After extended deliberation following a series of questions asked of the trial judge, about which more later, the jury returned with a verdict of murder in the first degree while not armed, thus adopting the third alternative above.

*437 A
Defendant's first objection to the charge, argued to the trial judge and now to us, concerns the instructions pertaining to the two degrees of murder of a non-police victim. Defendant notes the uncontradicted evidence that Buonocore was a police officer and was acting as such at the time he was murdered. No genuine issue as to that status was therefore created and, defendant argues, giving instructions concerning a finding unsupported by the evidence served only to confuse the jury as to the principles applicable to the genuine issues in the case they were to consider. The question raised by defendant is not free from difficulty. The charge as to degree of culpability and the quality of intent necessary to a conviction for second and first degree murder of a non-police victim imposes a heavier burden on the State since, with respect to such victim, the State must prove design and premeditation as well as intent to kill or do serious bodily harm, in order to obtain a first degree conviction. With respect to a police victim, the State need only prove intent to kill. State v. Madden, supra. Hence, defendant is in a poor position to contend that providing the jury with such an alternative prejudiced his cause.
On the other hand, considerable merit inheres in defendant's contention that, in the absence of evidence that Buonocore was not a police officer at the time he was killed, a charge relating to that evidentially unsupported status carried the potential for jury confusion. The charge, as given, required the jury, on a single hearing, to retain in its collective mind the required quality of intent for second degree and that for first degree murder of a non-police officer, as well as those intents appropriate to a finding of first and second degree murder of a police officer. Such difficult intellectual feats of memory should not be unnecessarily imposed upon a jury, previously unfamiliar with the principles of law they must apply. In short, a charge should be made no more difficult than the actual case requires.
*438 The problem is that no pre-charge conference regarding the proposed contents of the charge is apparent from the record. Defendant did not announce to the judge, in advance of the charge, that he was admitting Buonocore's status as a police officer and that, therefore, the charge regarding the degrees of murder pertaining to a non-police victim should not be given. It was only after the charge was given, after it was a fait accompli, that defendant made this point, at which time attempted correction might have complicated rather than simplified matters. The better practice would have been for the trial judge to have inquired of defense counsel before the charge as to whether the defense was contesting Buonocore's status as police officer. If defendant conceded that status on the record, he could not thereafter complain of the absence of the charge regarding murder of a non-police victim. If he rejected that concession, and wished to have the jury resolve Buonocore's status, again, he could not complain of any confusion caused by a charge he insisted be given. Adopting such a practice, where the existence of an issue is in any doubt, avoids the possibility of the defense later contending that the trial court either erroneously omitted a charge concerning a matter in issue, or, in the alternative, erroneously included it when it was not in issue. The defense should be required to adopt and adhere to a stated posture before the charge.
In the given circumstances, however, we conclude that instructing the jury on degrees of culpability associated with murder of a non-police officer did not constitute error, let alone reversible error. Although Buonocore's status as a police officer on duty was established by uncontradicted evidence, defendant did not concede the status before the charge. Moreover, uncontradicted evidence of the victim's status permitted the jury to easily select the principles applicable. The fact that the instructions allowed the jury to select principles imposing a more onerous burden upon the State could only redound to defendant's benefit.

*439 B
Post-charge proceedings gave rise to yet another claim of error arising from trial judge's responses to several questions posed by the jury. On two occasions the jury asked the judge to read the statutes referred to in his principal charge. He did so, reading to the jury the statutes defining the several degrees of murder of both a police and non-police victim, concerning the liability of an aider and abettor, and the liability of one armed while committing murder. No additional explanation was given in connection with the statutes, although defense counsel advised the court that by reading the statute pertaining to murder of a police officer, without the further explanation derived from Madden (given in the original charge), he was conveying the impression to the jury that a verdict in the first degree was the only possible verdict for murder of a police officer. Notwithstanding this advice, the trial judge declined to provide the additional instructions which the jury had not specifically requested, although in the second response he did advise the jury to apply as well those principles of law referred to in the original charge. Hence on two separate occasions the judge read to the jury the following statutory language without further explanation except to refer to the instructions in the original charge:
* * * murder of a police or other law enforcement officer acting in the execution of his duty * * * is murder in the first degree * * *. [N.J.S.A. 2A:113-2]
We agree with defendant that the effect of the two supplemental charges in which the trial judge merely read N.J.S.A. 2A:113-2 without again instructing them that murder of a police officer could be second degree murder if accompanied with an intent to do less than kill him was to lead the jury into concluding that murder of a police officer invariably carried with it first degree culpability. If second degree murder had been an available verdict under *440 the facts of this case, then the failure of the trial judge to comply with defendant's request to accompany the reading of the statute with an explanation of the circumstances in which a second degree conviction for the murder of a police officer would be appropriate, would be reversible error. We do not, however, agree with defendant, or the trial judge, that second degree murder of a police officer was a permissible verdict under the facts of this case, and the judge's failure to sufficiently advise the jury of its availability cannot, therefore, be regarded as reversible error.
State v. Madden, supra, explored the circumstances in which a second degree conviction for the murder of a police officer may be returned. In Madden the police officer victim was killed following pursuit by a mob which spontaneously formed after a wounding of one whom the officer was in the process of arresting. This incident occurred in a municipality with a recent history of race rioting. The mob pursued the officer for a considerable distance and some of its members inflicted fatal injuries for which defendants were duly charged as principals or as aiders and abettors. In explaining the circumstances in which aiding and abetting the murder of a police officer could result in a second degree murder conviction, notwithstanding the literal command of N.J.S.A. 2A:113-2 that such an offense be regarded as first degree murder, the court noted:
* * * We are dealing here with a mob pursuit of a policeman. Conceivably the intents could be many and different. There could be an intent to kill, or an intent to prevent the arrest of Williams by no more than a threat of injury, or an intent to harass or humiliate the officer.

* * * * * * * *
When, as here, a mob is involved in circumstances in which their understanding, intent and purpose may vary, it is difficult, but no less necessary, that the basis of the liability of the members of the mob be defined in the light of these sundry understandings, interests or purposes. [Id. at 396]
The evidence adduced in State v. Fair, 45 N.J. 77, 95 (1965) also permitted differing findings of intent with respect *441 to the participation of the two defendants. In the present case, however, no such options were available to the jury on the evidence presented. The jury could either acquit the defendant on a finding that he was ignorant of Jennette's purposes in going up to the roof and of his possessing the gun with which to accomplish the stated purpose, or they could conclude, in accordance with defendant's pretrial statement that he was made aware of Jennette's homicidal intentions and his possession of the means of carrying it out, that his conduct in accompanying him to the roof constituted aiding and abetting him in that endeavor and he therefore shared Jennette's intent and guilt of first degree murder. They could not, however, conclude that defendant accompanied the armed Jennette to the roof, knowing of his intention to shoot the police, and nonetheless find that in doing so he intended to do something less than kill, a finding necessary to second degree guilt under Madden. To permit the jury to conclude that in accompanying Jennette to the roof, knowing of his purpose in going there, he intended, for example, only to accomplish the wounding of an officer by shooting him in the leg or the arm, would be to approve speculation or indulgence in a fiction wholly unsupported by the evidence in the record. Defendant was either innocent in the sense that he intended no harm, or guilty of first degree murder in that he is deemed to have shared Jennette's intent to kill. No middle ground is available under the facts of this case. Simply because Madden renders available second degree culpability for murder of a police officer in specific circumstances does not mean that second degree guilt is invariably available whenever a police officer is murdered, any more than it is invariably available whenever murder of a non-police victim is concerned. State v. Davis, 50 N.J. 16, 27 (1967), cert. den. 389 U.S. 1054, 88 S.Ct. 805, 19 L.Ed.2d 852 (1968); State v. Sinclair, 49 N.J. 525, 540 (1967); State v. Mathis, 47 N.J. 455, 467 (1966). The possible degrees of culpability depend upon the evidence adduced; each case turns on its own facts.
*442 Hence, the jury's probable impression that it could only acquit or return a verdict of first degree murder was correct although defendant and the trial judge incorrectly conceived that second degree murder would have been a proper verdict. Since that is so, the supplemental charges which created the impression cannot be viewed as prejudicial to defendant and do not constitute reversible error.

II
We turn now to defendant's contention that the trial judge erred in rejecting a request to charge which concerned the implications from defendant's testimony that he was not present on the roof at the time the fatal shot was fired, having left immediately before that event. Both in his pretrial statement and in his testimony defendant averred that he had left the roof before the murder occurred. Evidence apart from defendant's own statements does provide some independent support of that fact. Defendant submitted the two following requests to charge, both of which were rejected by the judge:
1. That if you find that the Defendant went up to the roof of 49 Armstrong Avenue with the intention of killing or harming anyone, but that on the roof he quit that intention or idea and abandoned that purpose before an attempt was made to fire the weapon, then you must acquit the Defendant.
2. If you find that the Defendant went to the roof of 49 Armstrong as a mere observer and in no way participated in the shooting, then you must acquit the Defendant.

A
Implicit in the first request to charge is the proposition that if a defendant, who participates as an aider and abettor, absents himself from the immediate vicinity of the crime before it occurs, he cannot be found guilty. The requested charge does not accurately state the law, particularly in the present context, and the trial judge properly refused to so charge. Generally, presence at the scene of a crime *443 is not an essential element to the crime of aiding and abetting. State v. Smith, 32 N.J. 501, 521 (1960), cert. den. 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961). Clearly, one who would previously have been characterized as an accessory before the fact, one who planned the criminal event, or supplied necessary equipment or otherwise procured its commission, need not be present in order to be held as an aider and abettor. State v. Rosania, 33 N.J. 267 (1960), cert. den. 365 U.S. 864, 81 S.Ct. 828, 5 L.Ed.2d 826 (1961); State v. Garzio, 113 N.J.L. 349 (Sup. Ct. 1934), aff'd o.b. 116 N.J.L. 189 (E. & A. 1935). Similarly, one who positions himself at a distance from the scene in order to stand watch against intervention or to avoid apprehension does not escape being stigmatized as an aider and abettor. State v. Sullivan, 77 N.J. Super. 81, 89 (App. Div. 1962).
Even one who cannot be viewed as an accessory before the fact but rather as one who assented to the crime, "lent to it his countenance and approval," thereby aiding and abetting the crime (State v. Smith, supra 32 N.J. at 521) may not escape liability by simply fleeing the scene shortly before the crime occurs. In People v. Rybka, 16 Ill.2d 394, 158 N.E.2d 17 (Sup. Ct. 1959), defendant was convicted of murder by the court sitting without a jury despite the fact that he was not present when the fatal blow was struck. In Rybka two carloads of persons, bent on attacking the victim, started out together on that quest. The car in which defendant was seated became separated from the car in which the actual perpetrator was seated. Defendant was nowhere near the scene of the murder which subsequently took place. Defendant was nonetheless found guilty of the murder. The court stated:
It is alternatively contended on behalf of Budz and Gorski that, even though it be concluded that they encouraged Schwartz (the actual perpetrator) in the perpetration of a crime, the evidence indicates that they withdrew from any concert or common venture with those in the Oldsmobile when the Chrysler turned off at California *444 Avenue and that the fact of their withdrawal was communicated to Schwartz. Our attention is called to the general rule that "one who withdraws from a criminal enterprise is not responsible for the act of another subsequently committed in furtherance of the enterprise, provided the fact of withdrawal is communicated to the other conspirators." * * * However, it is the communication of intent to withdraw and not the naked fact of withdrawal that determines whether one who advised, encouraged or incited another to commit a crime is to be released from liability as an accessory before the fact. [158 N.E. at 23; citations omitted]
In People v. Lacey, 49 Ill. App.2d 301, 200 N.E.2d 11 (App. Ct. 1964), defendant was convicted of rape. The evidence disclosed that defendant had cooperated with others in the robbery of the ultimate rape victim. Following the robbery there appeared to have been a spontaneous decision to commit rape and the victim was taken to a basement. Defendant, however, after receiving his share of the fruits of the robbery left the scene of the rape without himself sexually assaulting the victim. He never touched the victim. He was, nevertheless, convicted of the rape, the court saying:
Defendant contends his actions in leaving the basement constituted an effective withdrawal from the common design. A person who encourages the commission of an unlawful act cannot escape responsibility by quietly withdrawing from the scene. People v. Marx (supra 291 Ill. [40] at 48, 125 N.E. 719). Here, Lacey told Jones he was leaving and just walked out. He then proceeded to a restaurant, where in the course of conversation he told two other boys what was happening back in the basement. Far from withdrawing from the rape his conduct indirectly sent two more rapists to the scene.
To be timely a withdrawal must be such as to give his co-conspirators a reasonable opportunity, if they desire, to follow his example and refrain from further action before the act is committed, and it must be possible for the trier of fact to say that the accused had wholly and effectively detached himself from the criminal enterprise before the act with which he is charged is in the process of consummation or has become so inevitable that it cannot reasonably be stayed. People v. Brown, 26 Ill.2d 308, 312-313, 186 N.E.2d 321 (1962). In order to constitute an effective withdrawal some kind of disapproval or opposition must be shown to the activities which the defendant knew had either preceded or were about to proceed. People v. Marx (supra 291 Ill. at 48, 125 N.E. 719). No such disapproval appears here at all. [200 N.E.2d at 14]
*445 To the same effect, see State v. Spears, 268 N.C. 303, 150 S.E.2d 499 (Sup. Ct. 1966); Blevins v. Commonwealth, 209 Va. 622, 166 S.E.2d 325, 329 (Sup. Ct. 1969); People v. Nichols, 230 N.Y. 221, 222, 129 N.E. 883, 885 (Ct. App. 1921); 1 Wharton, Criminal Law (1957 ed.), § 110 at 238.
Defendant's own testimony at trial, taken at face value, indicates that he simply left the roof when he saw Jennette take out his gun. Nothing in his testimony suggests that he communicated to Jennette that he was leaving or that he disapproved of the contemplated act, or that he otherwise sought to actively withdraw the support to the proposed event which his presence on the roof supplied. According to defendant, he merely left the scene within minutes before the shooting occurred. As a matter of law, such a spontaneous, unannounced withdrawal, without more, only briefly before the commission of the offense which had been previously encouraged by defendant's presence or other support,[1] is insufficient to insulate the defendant from criminal liability as an aider and abettor. In order to warrant an instruction to a jury concerning the effect of withdrawal from a criminal enterprise, evidence must disclose some effort on the part of the defendant to communicate the fact of his withdrawal and some attempt to neutralize the effects of his previous support. With such evidence the effect of a withdrawal is for the jury; without such evidence no issue for jury consideration is presented and any such instruction would be inappropriate.

B
The trial judge's rejection of defendant's second request to charge was not error. Defendant sought to have the *446 jury advised that if they concluded that he accompanied Jennette to the roof as a "mere observer," they should acquit him. The suggested statement of law is inaccurate in the present context. If the jury found (as their verdict suggests they did) that defendant, as a friend of Jennette, accompanied Jennette to the roof knowing of his intention to shoot the police and of his possession of the gun with which to accomplish this deed, they would not be required to acquit him (although they could have) even though he did not take an active part in the shooting. They could nonetheless have found that his mere presence lent approval to the act and supplied encouragement to Jennette, and that his presence as Jennette's friend in those circumstances constituted aiding and abetting. See State v. Holland, 234 N.C. 354, 67 S.E.2d 272, 275 (Sup. Ct. 1951). The charge that the mere presence at the scene of a crime does not, itself, render a defendant criminally responsible for whatever occurs sufficiently covered the ground and the judge's refusal to charge as requested was not error.

III
With defendant's next contention, we again confront prosecutorial misconduct, this time concerning misuse of prior conviction evidence. On direct examination defendant admitted a previous conviction for armed robbery, volunteering that he "just" took some money from a woman he knew. On cross-examination, the following ensued:
Q. You testified that you've been convicted of the crime of robbery?
A. Yes Sir.
Q. You've been convicted of the crime of putting someone in fear of their life. Is that correct?
A. Yes Sir.
At this point defense counsel interposed an objection which was sustained, and the trial judge instructed the jury to disregard the prosecutor's question. The examination then continued:
*447 Q. You testified that you took some money from a lady that you knew. Is that correct?
A. Yes Sir.
Q. But didn't you tell us that your accomplice was armed with a knife, did you?
At this point, defense counsel moved at side bar for a mistrial. The trial judge denied the motion but instructed the jury to disregard the details of the crime mentioned in the prosecutor's question. The prosecutor sought to justify this incursion into the details of the crime as a response to defendant's apparent attempt to minimize the importance of the offense by stating, on direct examination, that he "just" took money from a woman he knew. The trial judge found the proffered justification insufficient, as we do.
By this time prosecutors who are sufficiently qualified to be entrusted with a murder trial should know that, with the exception of R. 55 (not here pertinent), the only basis for admissibility of a defendant's prior convictions is to impeach credibility. N.J.S.A. 2A:81-12. Evidence of prior convictions, and of facts appearing on the judgment of conviction, may not be used to suggest to a jury that the defendant is prone to violence or is in any other way a bad man and therefore likely to have committed the offense for which he is being tried. Yet, that is precisely what the prosecutor in the present case attempted by the cross-examination previously quoted. He attempted to show defendant as a violence-prone individual and as one who habitually works through an accomplice who does the dirty deed for defendant. Such tactics are reprehensible in the extreme, and deserve condemnation. Trial courts should not tolerate repeated infractions of basic ethical principles by those who should know better. The contempt process is always available, and prosecutors continuing to indulge themselves by venturing beyond acceptable bounds of prosecutorial activity should not thereafter be accorded the privilege of representing the interest of the State.
*448 In the present case, however, the trial judge instructed the jury to disregard the offending matter and we are not at liberty to assume that the jury failed to comply. State v. Curcio, 23 N.J. 521, 528 (1957). Moreover, in the context of this lengthy trial, and in light of the extended deliberations of the jury, we are convinced beyond a reasonable doubt that the clear error of the prosecutor could not have affected the result. The error, in the circumstances (although inexcusable), was harmless.

IV
Defendant's remaining contentions concerning his motion for a change of venue, the admissibility of his pretrial statement, and the permitted cross-examination of defendant's employer all lack merit.
Finally, defendant contends that the trial judge erred in refusing defendant's application for a post-trial examination of jurors pursuant to R. 1:16-1. The application was triggered by a telephone call from a juror in the case days after the verdict had been returned. The attorney's affidavit reports the juror as having been told by another one that since the victim was a policeman first degree murder was the only alternative to acquittal.
Defendant argues that the statement by a juror representing a misstatement of law provides a sufficient basis for a post-trial examination of the jurors as to what occurred during deliberations. The trial judge disagreed and so do we. State v. Athorn, 46 N.J. 247, 251 (1966), cert. den. 384 U.S. 962, 86 S.Ct. 1589, 16 L.Ed.2d 674 (1966). Moreover, since we have already held that a verdict of second degree murder was not available under the facts of this case, the alleged statement by the juror was not, in fact, erroneous and the jury was not misled thereby to defendant's detriment.
We perceive no miscarriage of justice in the present case. By its verdict the jury clearly rejected defendant's testimony *449 at trial that he was innocent of all wrongdoings, that he lacked knowledge of Jennette's intentions and of his possession of a gun, and that as soon as he began to understand what Jennette was about to do, he fled. In convicting defendant of first degree murder the jury must have concluded that defendant accompanied Jennette to the roof with full knowledge of what he intended to do, thereby conveying to Jennette his consent, approval and support to this endeavor. Had such support not been given, the crime might never have been committed. The verdict finds ample support in the record and even if the jury considered defendant's last-minute unannounced flight as fact, an acquittal could not have been predicated on that fact alone. Nor, as we have attempted to explain, could the jury have reasonably found that defendant intended only to accomplish a wounding or scaring of the police officer. The state of the evidence permitted no such conclusion to be drawn. The jury rejected acquittal. The only alternative was the verdict they returned.
Affirmed.
NOTES
[1] Of course, a finding that defendant neither encouraged, resisted nor consented to Jennette's announced intention would have negated defendant's criminal responsibility, even without consideration of the defense of withdrawal.