THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PATTON JENKINS *et al.*, Defendants-Appellants.

First District (4th Division)    No. 79-1025

Opinion filed September 4, 1980.

James J. Doherty, Public Defender, of Chicago (Dennis E. Urban, Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joel A. Eisen-Stein, and Lawrence T. Krulewich, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Defendants Patton Jenkins and Frank Gibson were charged by indictment with committing the offenses of rape and aggravated kidnapping. Both defendants were found guilty of these charges in a bench trial and were sentenced to concurrent terms of seven years on each charge.

On appeal defendants contend that their rape convictions, which were based on an accountability theory, should be reversed because the State failed to prove that defendants assisted any person in committing such an offense. Defendants' convictions for aggravated kidnapping were based on the commission of a rape during a kidnapping; consequently they contend that these convictions should be reduced to kidnapping and the cause remanded for resentencing.

We affirm the judgment of the trial court.

The State's evidence was as follows. On November 29, 1975, Patricia B., then a 21-year-old student at a Chicago business college, met at a tavern a man identifying himself as Dan. Patricia later learned that his real name was Elmer Butler. Butler claimed to work for a modeling agency

and offered to prepare a portfolio for Patricia at a reduced price. Patricia, who had previously modeled for a church organization, agreed to pose for him and gave him her telephone number. Butler called her at home and arranged to meet her at the Museum of Science and Industry on December 15, 1975. They met there the afternoon of that day and Butler took photographs inside and outside the museum. Patricia then agreed to accompany him to what he said was his studio at 62d and Harper, several blocks from the museum. Patricia described the studio as a 1½-room apartment with a separate bathroom and a large room containing several pieces of furniture including a bed. Butler took a number of photographs. Then as Patricia was rearranging her hair, which she had altered for the session, Butler grabbed her around the neck and threw her onto the bed. When she screamed he threatened to harm her with a sharp object held to her neck. He stripped and bound her, applied a blindfold and gag, and raped her. When she asked him to release her he said she was being held for a $300 ransom. He then raped her again. Someone entered the apartment and Butler told that person to find his friends and tell them to return to the apartment.

Shortly after this the doorbell rang. Butler instructed Patricia to dress and led her, still blindfolded, into the bathroom. He answered the door and then led Patricia into the room to be "introduced," blindfolded, to two men who had come in. Butler told the men "I told you that we wouldn't have to wait that long and that we'd get somebody." He then left the apartment to call Patricia's mother, telling the men they could put their guns away. In 10 minutes he returned saying that her mother was not home yet. When Patricia became tired she was led to the bed where she lay down and fell asleep. She was awakened by Butler who again told her he was going to call her mother. He returned in 15 minutes to report that her mother said she would cooperate and that he would contact her again the next day at 5. Patricia had heard three male voices that day in the apartment, including Butler's voice.

Patricia's mother, who lived with Patricia, received a call at about 11:30 in the evening from a man who demanded a ransom of $500 and threatened that Patricia would be killed if the authorities were notified. She was instructed to await a 5 p.m. call the next day. She notified the police and the F.B.I. of the call.

Patricia slept again and was awakened in daylight to find someone lying next to her. That person had a conversation with another man in the room about getting food. The two voices were the same ones she had heard the evening before; neither was that of Butler. One of the men left briefly to get food and drink. As she ate the two men discussed what they would do with the money they were to receive. Butler returned to the apartment and discussed with the two men what they would do if they

were Patricia. They agreed that they would not tell the police. The group was in what Patricia described as the kitchen of the apartment although she did not testify that this was a separate room.

Butler told the men they could rest. He placed Patricia on the floor near the bed and raped her. The doorbell rang and he led her to the bathroom where he again raped her. One of the two men with whom they had been sitting knocked on the bathroom door and said it was all right to come out. Butler told him he was using the bathroom and raped Patricia once more. Butler then left the apartment, telling Patricia he was going to contact her mother and if all went well she would be home by 6. He also told her he could not control sexual abuse by the others. After Butler left someone else entered the bathroom and raped Patricia.

On December 16 at 5 p.m. Patricia's mother received a telephone call instructing her to go to 52nd and Cottage Grove to retrieve a message in a phone booth. She went there but found no message.

At the apartment Patricia was led from the bathroom to a chair. There was silence for a long period, and then she heard a new voice of someone who stuttered. After 6 p.m., a time she pinpointed by hearing a radio, she asked what was going to happen to her. A voice which was the same as that of one of the two men she heard that morning told her she would be released when Butler returned if all went well. Patricia was still blindfolded. Shortly thereafter Butler returned to tell her he had missed contact with her mother but would give her one more chance.

Patricia was informed that she would be taken to another location and released. Her blindfold was removed but she was warned that she was to be released, after the ransom was received, only because she had not seen the other two men. If she saw them she "would have to be taken care of." Accordingly she was instructed to keep her eyes closed and not to lift her head. She was led to a car by Butler and got in the back with him. The other two men from the apartment got in the front. Again she knew them to be the same men by their voices.

After driving for some time the car stopped and Butler got out, saying that he was going to call Patricia's mother to arrange the meeting. One of the two other men got into the back seat with Patricia.

At 9 p.m. Patricia's mother received a telephone call instructing her to go to 92nd and Halsted; there a note had been left instructing her to leave the money and go home. She left a bag containing only paper and proceeded home.

Butler returned to the car in which Patricia was held and told the men to drive several blocks away. They drove there and waited for him but when he failed to return they began to drive around in search of him. The vehicle was stopped by the police. Patricia, who still had her eyes closed, was told by the man sitting by her to tell the police, if asked, that she was Sharon Jenkins and they had just come back from a party. A man identify-

ing himself as a police officer helped Patricia out of the car, searched her for weapons, and led her to another car. One of the men with Patricia had explained that Patricia was his wife, Sharon Jenkins, and that she was sick after having left a party. Patricia kept her head down and her eyes closed during this entire episode. She heard the policeman call in his "police car number," 6111 when he was checking on the vehicle. The police then spoke to the two men by name as Patton Jenkins and Frank Gibson, telling them they could leave. Patricia returned to the car and they drove off. On cross-examination she explained that she did not tell the police what was occurring because she was terrified and wished to maintain her safety.

Chicago Police Officer George Kling testified that late on the evening of December 16 he and his partner stopped a car with one headlight at 87th and Halsted. The defendant Jenkins was sitting in the back with Patricia's head on his lap. Jenkins identified her as his wife and said she was drunk and sick from a party. Defendant Gibson was the driver of the car. Patricia kept her eyes closed and her face down as she was helped out of the car. In radioing to check on the vehicle the officers used their beat number, 6111. The defendants both gave Kling their names and addresses. Defendants were told they were free to leave and they drove off with Patricia.

Patricia was driven by the men to an area near her home where she was released. When she heard the car drive away she opened her eyes and fled to her house. She told her mother that she had been raped and gave the police the number of the police car that had stopped the car in which she had been held.

Investigator J. C. Gibson of the Chicago police questioned the defendants after their arrest. Defendant Jenkins admitted being present in the building with Patricia, who was blindfolded. He had watched her for Butler, who was going to split the ransom money with him. Jenkins denied having raped Patricia or having seen anyone else raping her. Defendant Gibson also admitted being in the apartment where Patricia was held. He was not sure what was happening, but Butler had promised him some money for the use of his car. He and Jenkins stayed with Patricia while Butler made a phone call. In their statements both defendants admitted having accompanied Butler and Patricia in the car in search of the ransom money.

At trial both defendants denied having made any incriminating statements to the police. Defendant Jenkins said he first saw Patricia when she was with Butler at Jenkins' brother's apartment. Jenkins testified that his brother stuttered. He noticed nothing unusual about Patricia. Butler asked if he and Patricia, whom he identified as his girlfriend, could have a ride home. Defendant Gibson testified that he saw Patricia for the first time as she emerged from the building with Jenkins. Both defendants

testified that they let Butler out at one point to see his mother. When Butler failed to return they proceeded to drive Patricia home. On the way the police stopped them but allowed them to continue after checking their identification and verifying that the car belonged to Gibson. They then drove Patricia home.

## I.

The primary issue before us is whether there was sufficient evidence to establish defendants' accountability for the rape of Patricia. Defendants concede there was sufficient evidence to establish their guilt for the kidnapping of the victim, and their challenge of their convictions for aggravated kidnapping is based entirely on the claim that the aggravating factor of rape was not established as to them.

Defendants were convicted on an accountability theory under section 5—2(c) of the Criminal Code (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c)), which provides in pertinent part:

"A person is legally accountable for the conduct of another when:

\* \* \*

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

Defendants note the well-established principle that mere presence or negative acquiescence during the commission of an offense is not enough to establish accountability for that offense. (*People v. Kessler* (1974), 57 Ill. 2d 493, 315 N.E.2d 29, *cert. denied* (1974), 419 U. S. 1054, 42 L. Ed. 2d 650, 95 S. Ct. 635; *People v. Marx* (1919), 291 Ill. 40, 125 N.E. 719.) However, as was stated in *People v. Cole* (1964), 30 Ill. 2d 375, 379, 196 N.E.2d 691, 693, 694:

"While it is true that mere presence or negative acquiescence is not enough to constitute a person a principal, one may aid and abet without actively participating in the overt act and if the proof shows that a person was present at the commission of the crime without disapproving or opposing it, it is competent for the trier of fact to consider this conduct in connection with other circumstances and thereby reach a conclusion that such person assented to the commission of the crime, lent to it his countenance and approval and was thereby aiding and abetting the crime. [Citations.]"

In this cause the evidence adduced by the State established that defendants were present in the apartment while the victim was raped three times. The first of these rapes apparently occurred in their immediate presence. The victim was taken from the kitchen area where she sat with the defendants to an area on the floor near the bed, where she was raped. She had described the apartment as containing only one large

room with a bed in addition to the separate bathroom. The second of these rapes occurred in the bathroom but it was one of the defendants who signalled her attacker that it was safe to emerge after someone had come to the door of the apartment. Butler told them he was "using" the bathroom and did not come out until he had raped Patricia again. The evidence also established that the defendants were left to guard Patricia when Butler left the apartment; they discussed what they would do with the ransom money, and following the rapes they continued to participate in the scheme by helping to transport Patricia out of the apartment and holding her in the car while Butler made ransom demands.

Upon reviewing this evidence we are satisfied that the trial court was justified in concluding that the actions of the defendants made them legally accountable, under the principles we have discussed, for the rape of the victim. Defendants' behavior amounted to considerably more than negative acquiescence. Accordingly we will not disturb the determination of the trial court on this issue.

As we have noted, the sole basis for defendants' contention that their convictions for aggravated kidnapping should be reversed is their challenge of their rape convictions. Our finding that the rape convictions were justified also disposes of this contention.

The judgment of the trial court is affirmed.

Affirmed.

LINN, P. J., and JIGANTI, J., concur.