STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. STEVEN THOMAS, DEFENDANT-APPELLANT.

Argued September 19, 1977—Decided May 22, 1978.

346

*Mr. James E. Flynn,* Designated Counsel, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

*Mr. Alan D. Bowman,* Deputy Attorney General, argued the cause for respondent (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Marcel R. Plaut,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

PASHMAN, J. This multi-faceted appeal involves several important issues. The Court must decide whether the failure to include the instructions mandated by *State v. Madden,* 61 *N. J.* 377 (1972), in supplemental jury charges provided in response to a jury's questions concerning the proper interpretation of *N. J. S. A.* 2A:113-2 constitutes reversible error. We must also examine the effect of certain forensic improprieties committed by the prosecutor during cross-examination involving inquiry into a prior conviction and a reference to defendant's alleged heroin addiction. Furthermore, since the trial court arguably charged the jury with respect to a crime whose elements are not sustainable

by the evidence adduced, we must decide whether such a charge is reversible error under *State v. Christener,* 71 *N. J.* 55 (1976), even if the error is non-prejudicial.

## I

Officer Casper Buonocore of the Jersey City Police Department was shot and killed by Franklin Jennette on the evening of September 12, 1973. Jennette and two other men, defendant Steven Thomas and David Cheatham, were arrested in the building from which the shot was fired within minutes of the crime. Jennette later pleaded guilty to a charge of murder and received a sentence of life imprisonment. Defendant and Cheatham were also indicted for murder as aiders and abettors.

On the night of September 12, 1973, Officers Buonocore and Vogel were on motorcycle patrol. At approximately 8:45 P.M., while proceeding on Ocean Avenue they observed a double-parked car. The officers issued a summons to the driver of the car, Sam Williams, when he refused to respond to their direction to move his vehicle. A radio check indicated that Williams had an outstanding arrest warrant for a motor vehicle violation. The officers called for a radio car to transport Williams to the police station and attempted to arrest him. The radio car arrived and Williams was being led to it when his 13 year old daughter, Teresa Sutton, appeared and began to strike Vogel. When Vogel attempted to arrest her for assaulting an officer, she struggled further. After Officer Kevin Oris arrived on the scene, he too attempted to restrain her, but she kicked him and scratched his face. Oris then struck Teresa Sutton on the head with his nightstick and she fell to the ground unconscious.

Sergeant John McAuley arrived at the scene, took command, and attempted to control the crowd which had gathered in the meantime. Buonocore radioed for an ambulance and attempted to render aid to the young woman. More

police arrived as the crowd continued to grow. Mr. Williams was taken to the police station and Teresa Sutton was taken to the hospital in an ambulance.

McAuley ordered Officers Buonocore and Vogel to resume their routine patrol. As they were pulling away a shot was fired and Officer Buonocore fell from his motorcycle to the ground. No other shots were heard. The ambulance was called back immediately. However, Officer Buonocore was pronounced dead at 9:00 p.m. at the hospital.

An unidentified individual shouted that the shot had been fired from the corner apartment building at 49 Armstrong Avenue. Vogel ran to the building entrance where he met two other officers. Three to five minutes had elapsed since the shooting. Officers Vogel and Oris entered the building. They proceeded to a stairway, coming upon defendant running down the stairs from an open apartment door on the second floor. The defendant was handcuffed, taken outside and held on the ground. Vogel re-entered the building and observed Jennette and Cheatham standing near the door of a vacant third floor apartment from which they had apparently just emerged. These men were handcuffed and placed outside with defendant. Hughes Bryant, a fourth suspect, was also taken into custody at this time.

A search of the premises turned up the murder weapon in a garbage bag located on the third floor landing, at the foot of a ladder leading to the roof. The weapon was a .32 caliber Smith and Wesson revolver, between 50 and 100 years old. It was in good working condition but had a broken handle. A State Police ballistics expert positively concluded that the bullet which killed Officer Buonocore had been fired from this pistol.

Defendant was taken to the police station where he was questioned by Detective Robert Worthy and gave a statement. At trial the defense challenged the voluntariness of this statement. A *voir dire* was held and the judge ruled

that both defendant's oral statement to Detective Worthy and his written statement were admissible.

Defendant's written statement indicated that he had seen Jennette at about 8:00 p.m. on the evening of September 12, 1973 at Pee Wee's, a neighborhood bar. He admitted to seeing Jennette's gun at that time. The two proceeded to 49 Armstrong Avenue, to a second floor apartment where defendant's statement indicated they planned to obtain some drugs. Defendant David Cheatham came upstairs and told them of the excitement below involving Williams and his daughter. They went down to the street to observe the scene. Jennette then indicated that the three should go upstairs. When Thomas asked why, Jennette replied that he intended to shoot the police.

The statement went on to indicate that the three went to a second floor apartment in order to get out to the fire escape. They were not allowed in by the occupant and thus went to the top floor and used a ladder there to reach the roof. As the three leaned over the side of the roof to observe the activity below, Jennette took out a gun and Cheatham told him which policeman to shoot. Defendant claims that upon seeing the gun he ran back down the ladder to the top floor, and then heard the shot. He then proceeded to the second floor apartment he had earlier been visiting. The occupant let him in and he stayed about five minutes. Upon leaving the apartment to go downstairs, he was apprehended.

Hughes Bryant occupied the second floor apartment at which the three had stopped in an effort to view the scene below. Bryant testified that they asked to use his window. When he denied the request, one of the three asked if there was another way to the roof, and he showed them the location of the fire escape. Bryant thought that Thomas had asked the question but was not absolutely sure. Bryant testified that Thomas did state that the three should not use the fire escape to get to the roof. He observed a shiny object on Jennette's left side but was not aware that it was

a gun. The three then disappeared up a staircase. Five minutes later he heard a shot sounding like it came from above. At his window, Bryant observed Officer Buonocore fall to the ground. Bryant went downstairs and was taken into custody. At police headquarters he identified defendant, Cheatham and Jennette as the three men who had come to his apartment.

Defendant testified at his trial and contradicted his earlier statement to Detective Worthy that he had seen Jennette's gun at Pee Wee's bar. He denied seeing the gun at any time prior to the shooting and further denied that he and Jennette proceeded to his friend's apartment at 49 Armstrong Avenue in the hope of securing drugs. Defendant also denied telling Worthy that Jennette had told him while they were at street level that he was going to shoot a police officer. He further denied having any knowledge prior to reaching the roof of Jennette's intent to shoot someone. The defendant added that when he saw the gun and heard Cheatham tell Jennette to shoot the police, he immediately left the roof and was at the bottom of the ladder on the landing below where he heard the shot.

On direct examination defendant admitted to a prior conviction for robbery, stating that he took money from a lady that he knew. On cross-examination, the prosecutor asked defendant whether he had been convicted of the crime of putting someone in fear of his life. He answered affirmatively before his counsel's objection was sustained and a limiting instruction given. The prosecutor gave little heed to the judge's disapproval of this kind of questioning. Instead, he went on to ask why defendant failed to tell the jury that when he had taken money from a lady he knew, his accomplice in the crime had a knife. Another objection ensued and at a side bar conference, defense counsel asked for a mistrial. That motion was denied. The judge issued a strong instruction to the jury to disregard this information.

Soon thereafter, over defense counsel's objection, the prosecution was permitted to ask the defendant whether he was ever an addict and whether he had ever used heroin. When defendant answered all of these questions in the negative, he was confronted with a medical questionnaire from the Hudson County Jail which was filled out on September 13, 1973 by an inmate trustee and a corrections officer and which was signed by defendant. The form carried a notation which read "Drugs, 15 bags per day. Last fix September 12, 1973." Defendant denied both the truthfulness of this information and that he had ever told anyone that he had a habit.

In charging the jury under *N. J. S. A.* 2A:113-1 and 2A:113-2 the judge pursued alternate theories. First, he charged the jurors on their relevant considerations if they found that the victim was a police officer murdered in the performance of his duties. Second, he instructed the jurors on the applicable law should they conclude that the victim was not a police officer. The accuracy of these charges is not disputed. However, defense counsel objected to the charge respecting the killing of a non-police officer on the ground that it was never contended that decedent was not a police officer and that the extraneous charge might confuse the jury. The judge responded that since the defense counsel had not stipulated that decedent was an on-duty police officer, the charge was proper.

Consistent with *State v. Madden, supra,* the jury was instructed that if decedent was killed while in the performance of his duties as a police officer, a verdict of first degree murder required a finding of intent to kill. Premeditation and deliberation were not required. However, if the intent was not to kill but to inflict harm, no matter how grievous, only a conviction for second degree murder would be warranted.

Since defendant was charged as an aider and abettor under *N. J. S. A.* 2A:85-14, the judge also instructed the jury as to the legal principles necessary to establish de-

fendant's status as such. He noted that presence at the scene of the crime, in and of itself, is insufficient to render defendant a participant in it. However, the judge added that proof of presence at the scene of the commission of the crime without disapproving or opposing the criminal act is evidence from which, in connection with other circumstances, the jury could infer that defendant lent his countenance and approval to the crime and thereby aided and abetted its commission.

After charging the jury under *N. J. S. A.* 2A:151–5, the statute imposing an additional penalty for crimes committed while armed, the judge advised the jury as to the five possible verdicts which it could return: acquittal, murder in the first degree, murder in the second degree, murder in the first degree while armed and murder in the second degree while armed.

The jury retired for deliberations at 11:00 A.M. on February 7, 1974. The jury sent three notes to the judge requesting additional information. The first request does not concern us. The second request came at 4:10 P.M. on February 7, and asked the judge to re-read the parts of the charge where he cited the various statutes. The judge re-read the pertinent parts of *N. J. S. A.* 2A:113–1, 2A:113–2, 2A:85–14 and 2A:151–5. Fearing that a mere reading of *N. J. S. A.* 2A:113–2 would leave jurors with the impression that whenever a police officer was murdered the crime was first degree murder, defense counsel objected to the supplemental charge. He requested that the judge reinstruct the jury in accordance with *State v. Madden, supra,* as to the fact that a finding of intent to kill is necessary to support a verdict of first degree murder. The judge refused this request. A third request at 11:45 A.M. on the following morning asked for a further reading of the statutes, or for a copy thereof. The judge then re-read the statutes and admonished the jury to remember that it must also bear in mind the other things he had told them in his original charge. Defense counsel renewed his objection to the read-

ing of the general murder provisions and of the failure to specifically recharge under *State v. Madden, supra.*

The jury returned to the courtroom at 2:30 P.M. with a verdict of guilty of murder in the first degree. The judge immediately imposed the mandatory life sentence.

On February 12, 1974 defense counsel alleges that he received a telephone call from a juror. The juror told him that the requests for supplemental instructions came as a result of confusion on the part of the jury as to whether a second degree murder conviction could be returned. The trial judge's re-reading of the statutory provisions dealing with murder of a policeman did not produce any reference to second degree murder. Thus, one juror told the others that a verdict of second degree murder was not possible in the case since it concerned the murder of a police officer. A few days later the defense counsel was called at work by another juror who wished to express concern about the verdict. He instructed the juror to stop informing him and to communicate any problems she had with the case to the trial judge. Defense counsel moved for a new trial and for leave to examine the jurors pursuant to *R.* 1:16–1. Both motions were denied.

Defendant's appeal before the Appellate Division was unsuccessful and his conviction was upheld. 140 *N. J. Super.* 429 (App. Div. 1976). This Court granted defendant's petition for certification. 71 *N. J.* 495 (1976).

## II

In *State v. Madden, supra,* 61 *N. J.* at 389–390, we held that *N. J. S. A.* 2A:113-2 elevated the intentional killing of a police officer who is executing his duty from second to first degree murder without proof of deliberation or of premeditation. Yet, the fact that a police officer was killed is not, in and of itself, sufficient to trigger a finding of first degree murder. As we cautioned, "[i]f the intent is to do bodily harm, the offense remains murder in the second degree, and this, as we have said, whether the

intended harm is grievous or less than grievous." *Id.* It is undisputed that the trial judge made this distinction in his original charge. However, after the jury began deliberations and on two occasions requested clarification of the statutes involved, he twice read the following portions of *N. J. S. A.* 2A:113–2 verbatim to the jury without the benefit of further comment:

Murder which is perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or murder of a police or other law enforcement officer acting in the execution of his duty is murder in the first degree. Any other kind of murder is murder in the second degree. A jury finding a person guilty of murder shall designate by their verdict whether it be murder in the first degree or in the second degree.

■ As is apparent, a literal reading of *N. J. S. A.* 2A:113–2 indicates that anytime an on-duty police officer is killed, the person responsible is guilty of first degree murder, even if he only intended a lesser injury to the officer. The second time he re-read *N. J. S. A.* 2A:113–2 in response to a question, the judge indicated that the jurors should keep in mind the principles referred to in the original charge. However, we agree with the conclusion of the Appellate Division, 140 *N. J. Super.* at 439, that the effect of the supplemental charges in which the trial court merely re-read *N. J. S. A.* 2A:113–2 without re-instructing the jury in accordance with *Madden* was to lead the jury into concluding that first degree murder was the only possible verdict under that statute.

■ We conclude, however, that the Appellate Division erred in finding the mistake harmless. Under both *State v. Madden, supra,* 61 *N. J.* at 390–391, and *State v. Fair,* 45 *N. J.* 77, 94–96 (1965), parties to an unlawful homicide may be guilty of offenses of different degrees depending upon their respective participation and intent. Assuming that Thomas was indeed guilty of aiding or abetting in the murder of Officer Buonocore, his individual culpability depended entirely upon his own actions, intent and state of mind.

If both parties enter into the commission of a crime with the same intent and purpose each is guilty to the same degree; but each may participate in the criminal act with a different intent. Each defendant may thus be guilty of a higher or lower degree of crime than the other, the degree of guilt depending entirely upon his own actions, intent and state of mind.

[*State v. Fair, supra*, 45 *N. J.* at 95]

The Appellate Division erred in concluding that the jury could not have found that Thomas had an intent that was different from Jennette's. The only evidence of intent came from the disputed answers in defendant's written statement.

Q. Why did Frankie Jennette tell you to accompany him to the roof?
A. To shoot the police.

 * * * * * * *

Q. When did Frankie say he was going to shoot the cop?
A. When he was down in the street looking at the incident.

While the use of a deadly weapon raises an inference that there was an intent to kill, *see State v. Van Duyne*, 43 *N. J.* 369, 377 (1964), *cert.* den. 380 *U. S.* 987, 85 *S. Ct.* 1359, 14 *L. Ed.* 2d 279 (1965); *State v. Bucanis*, 26 *N. J.* 45, 54, *cert.* den. 357 *U. S.* 910, 78 *S. Ct.* 1157, 2 *L. Ed.* 2d 1160 (1958), a jury may reject such an inference. Even if it concluded that Thomas indeed abetted Jennette in shooting the police officer, the jury could have found that he desired only a disabling or wounding of Officer Buonocore. He may have considered a wound as retribution for the injury to the girl, the responsibility for which Cheatham mistakenly attributed to Buonocore.

In *State v. Williams*, 29 *N. J.* 27, 36–37 (1959), the Court recognized that one may shoot with an intent to disable rather than to kill. In *Commonwealth v. O'Searo*, 466 *Pa.* 224, 352 *A.* 2d 30 (1976), the Supreme Court of Pennsylvania held that specific intent to kill may be inferred by the jury where the defendant intentionally fired a gun at a vital part of the victim's body. However, the

Court was careful to point out that this was only a permissible inference.

> First we know of no proposition more consistent with human experience than the conclusion that absent circumstance to the contrary, a person intends the natural and probable consequences of his act. It is also important to bear in mind that the inference is only a permissible one and need not be accepted by the finder of fact. * * * Thus, the jury must reject the inference where the circumstances negate the existence of such an intent . . . and may ignore the inference even absent such circumstances.
>
> [352 *A.* 2d at 37; citations omitted; footnote omitted]

In *Lisenby v. State,* 543 *S. W.* 2d 30, 31 (Ark. Sup. Ct. 1976), the court made the folowing observation regarding the crime of assault with intent to kill: "Of course, intent to kill may be inferred from acts and circumstances of the assault but it cannot be implied as a matter of law." To the same effect is *State v. Steimle,* 453 *P.* 2d 171, 172 (Sup. Ct. 1969), where the Supreme Court of Oregon reiterated its view that ". . . since the presumption of innocence is a species of evidence, instructions on conclusive presumptions should never be given in a criminal case. . . ." Thus, an instruction to the effect that "[t]he law conclusively presumes an intent to murder from the deliberate use of a deadly weapon that causes death within one year . . ." was held to be reversible error. Moreover, in *State v. Bolden,* 494 *S. W.* 2d 61, 65 (Mo. Sup. Ct 1973), the court observed that "[t]he law presumes malice as a concomitant of a shooting with a dangerous and deadly weapon, . . . but the element of intent remains a question for the jury and the law raises no presumption about it."

 Regardless of whether or not a defendant presents evidence to rebut the permissible presumption that by using a firearm to shoot at an individual he intended to kill that person, it is up to the jury to decide whether defendant indeed possessed such intent. We are not unmindful of the possibility that impermissible compromise verdicts may re-

sult. We simply conclude that the jury is the finder of fact. As the Court of Criminal Appeals of Alabama properly observed:

> Intent to take life may be shown by inference, via the character of the assault, the use of a deadly weapon, and other attendant circumstances. . . .
>
> The jury may give to this evidence, as with all evidence, such emphasis and weight as they alone think proper in arriving at their verdict. . . .
>
> [*Smith v. State*, 344 *So.* 2d 213, 216 (Ala. Cr. App. 1977) ; citations omitted]

Moreover, in *Mullaney v. Wilbur*, 421 *U. S.* 684, 95 *S. Ct.* 1881, 44 *L. Ed.* 2d 508 (1975), the Supreme Court held that the prosecution must prove beyond a reasonable doubt every fact necessary to constitute the crime charged. The Court invalidated a construction of Maine's homicide law which required a defendant charged with murder to prove that he acted in the heat of passion to reduce the crime to manslaughter. Thus, even where the State shows that a defendant used a deadly weapon, the jury must be permitted to draw its own conclusion as to his intent. The defendant has no burden to affirmatively present evidence of his lack of deadly intent.[1]

---

[1]The recent Supreme Court decision in *Patterson v. New York*, 432 *U. S.* 197, 97 *S. Ct.* 2319, 53 *L. Ed.* 2d 281 (1977) has no effect on the instant case. There the Court upheld a statute which provided that once the State had proved elements of second degree murder, intent to cause the death of another person and causing the death of that person, the defendant could reduce the crime to manslaughter by proving by a preponderance of the evidence that he was under reasonably explainable extreme emotional disturbance when he committed the crime. *Mullaney* was deemed unaffected since the State had to prove all elements of second degree murder beyond a reasonable doubt, whereas in *Mullaney* malice, or lack of provocation, was presumed. The following excerpt from the jury charge in *Patterson* indicates that ti fully comports with our holding herein.

"Before you, considering all of the evidence, can convict this defendant or any one of murder, you must believe and decide that

■ We hold that it was error for the trial judge to merely read *N. J. S. A.* 2A:113–2 in response to the questions of the jury. The fact that jurors twice requested a re-reading of that statute, coupled with the timely request of defense counsel that the court clarify the statute as we did in *Madden*, should have alerted the judge to potential jury confusion which would redound to defendant's prejudice. We do not mean to imply that every response to a question of a jury requires a full re-charge by the trial judge. However, with respect to *N. J. S. A.* 2A:113–2, whose very language can be read in a manner inconsistent with the holding of *Madden*, mere recitation of the statutory language without further comments explaining that holding is error where the killing of an on-duty police officer is the offense being tried.

## III

When he attempted to go into the details of defendant's past conviction for armed robbery, the prosecutor embarked on a line of questioning which was clearly improper. Moreover, the scenario of questions indicates that his action was deliberate, despite a realization of its impropriety. On direct examination of Hughes Bryant, the prosecutor elicited the fact that the witness had been convicted of the crime of larceny from the United States mails. After stating the year of conviction and the sentence imposed, the witness

the People have established beyond a reasonable doubt that he intended, in firing the gun, to kill either the victim himself or some other human being. . . . Always remember that you must not expect or require the defendant to prove to your satisfaction that his acts were done without the intent to kill. Whatever proof he may have attempted, however, far he may have gone in an effort to convince you of his innocence or guiltlessness, he is not obliged, he is not obligated to prove anything. It is always the People's burden to prove his guilt, and to prove that he intended to kill in this instance beyond a reasonable doubt.
[432 U. S. at 199, 97 S. Ct. at 2321, 53 *L. Ed.* 2d at 285–6]

was asked, "What did you take?" The defense counsel objected to this question and that objection was sustained. Thus, wholly aside from our decisional law, the prosecutor knew that the trial judge considered such questioning improper. Yet, the very next day, in cross-examining Thomas, the prosecutor again zeroed in on the specific details of the offense underlying defendant's criminal conviction. The fact that Thomas had been convicted of armed robbery was properly admitted under *N. J. S. A.* 2A:81–12 as having a bearing on his veracity.[2] *State v. Hawthorne,* 49 *N. J.* 130 (1967). However, that statute's consistent construction is that it authorizes proof by cross-examination only of the factual components of prior conviction. *State v. Garvin,* 44 *N. J.* 268, 280 (1965); *State v. Tune,* 17 *N. J.* 100, 111 (1954); *State v. Taylor,* 5 *N. J.* 474, 479 (1950); *State v. LaDuco,* 89 *N. J. Super.* 159, 169 (App. Div. 1965); *State v. Kobylarz,* 44 *N. J. Super.* 250–255 (App. Div. 1957), certif. den. 24 *N. J.* 548 (1957); *State v. Nagy,* 27 *N. J. Super.* 1, 8 (App. Div. 1953). Presumably aware of this restriction, the prosecutor indulged in the following questions:

Q. You testified that you've been convicted of the crime of robbery?
A. Yes, sir.
Q. You've been convicted of the crime of putting someone in fear of their life, is that correct?
A. Yes, sir.
Defense Counsel: Objection.
The Court: Sustained. The jury is instructed to disregard the question of counsel.
Q. You testified that you took some money from a lady that you knew; is that correct?

---

[2]We note that our holding this term in *State v. Sands,* 76 *N. J.* 127, 147 (1978) (slip opinion at 24), which overruled *State v. Hawthorne, supra,* has prospective application and would not be retroactively applicable to the 1974 trial in this case. However, in view of our disposition, should defendant be retried, that holding will be fully applicable.

A. Yes, sir.

Q. But you didn't tell us your accomplice was armed with a knife, did you?

Defense Counsel: Objection. Judge, I would like to approach side bar.

The prosecutor claimed that he was entitled to ask these questions because defendant made a gratuitous comment when he admitted his prior conviction for armed robbery to the effect that he took money from a woman. We agree with the courts below that defendant's statement did not open the door for the prosecutor's improper questions. The judge then heard and denied defendant's motion for a mistrial. Instead, he gave a strong instruction to the jury to disregard this information.

The Appellate Division correctly perceived that the State was attempting to depict defendant as a violence-prone individual who habitually works through an accomplice who does the actual dirty deed for defendant. 140 *N. J. Super.* at 447. We agree with the lower court that this prosecutorial conduct is intolerable. However, we are not as certain as was the Appellate Division that the judge's instruction was sufficient to dissipate the effect of these questions.

 *R.* 2:10–2 states that "[a]ny error . . . shall be disregarded . . . unless it is of such nature as to have been clearly capable of producing an unjust result." In *State v. Macon,* 57 *N. J.* 325, 336 (1971), we refined this standard into a test of whether a reasonable doubt exists that the error "led the jury to a result it otherwise might not have reached." A similar standard applies to our review of a court's denial of a motion for a mistrial. Only where the judge abuses his discretion in not finding "manifest injustice" in the absence of a new trial will we reverse on that ground. *State v. DiRienzo,* 53 *N. J.* 360, 383 (1969). Considering the prompt curative charge, these improper questions by the prosecutor, standing alone, might not be sufficient to require reversal. However, when the prejudice from these questions is combined with the other improprie-

ties in defendant's trial, a picture emerges of a trial which was less than fair.

A second line of improper questioning was also prejudicial to defendant. The trial judge erroneously permitted the prosecutor to question defendant about whether he was ever an addict and whether he ever used heroin. After a negative answer, defendant was confronted with a medical questionnaire dated September 13, 1973 from the Hudson County jail, indicating that defendant used "15 bags a day" and had had his last fix the day before. This series of questions was promptly objected to by defense counsel. Upon being overruled, he reserved his objection to this line of questioning for the record.

While defendant's negative response certainly raised the issue of his veracity, we find no justification for the question which led to his reply. In *State v. Mathis,* 47 *N. J.* 455, 470–471 (1966), we held that where the State cross examines a defendant on an irrelevant matter which would not be independently admissible, an untruthful answer may not be used to impeach the defendant's credibility. There was not even a scintilla of evidence to the effect that drug addiction had any connection whatsoever with defendant's decision to accompany Jennette and Cheatham to the roof. Again, the prosecutor was attempting to portray the defendant to the jury as an evil character. This series of questions came only minutes after the improper questioning concerning defendant's past.

For some reason, defendant did not raise this issue on appeal. We raise it *sua sponte* pursuant to *R.* 2:10–2 because it is apparent that in combination with the earlier improper inquiries about defendant's record, the questions concerning his alleged drug addiction so prejudiced him that there is considerable doubt that he received a fair trial. Within a very short time the defendant was depicted as a conniving, violence-prone person who was a dangerously unpredictable heroin user. The implication was unmistakable: present charges aside, society would be better off with de-

fendant behind bars. Thus, two inflammatory factors of no relevance whatsoever to defendant's guilt or innocence of the crime for which he was charged were injected into the trial.

IV

The facts adduced at trial lent no support to a theory that the victim was either a civilian or an off-duty policeman. The better procedure would have been for the judge to have had both counsel stipulate that all charges pertained to the killing of an on-duty policeman. Defendant's counsel made a timely objection to the charge applicable to the murder of a civilian. Defendant now alleges that by injecting confusing and irrelevant elements into his charge the judge confused the jury to defendant's prejudice.

In *State v. Pacheco,* 38 *N. J.* 120, 130 (1962), we concluded that the trial court erred in charging the jury on second degree murder and manslaughter where he was really guilty of first degree felony-murder or not guilty at all. However, our reversal was based on other grounds. In *State v. Christener,* 71 *N. J.* 55, 69 (1976), we held that it was reversible error to charge the jury concerning the elements of first degree murder where the facts of the case could not support a verdict for that offense. The court observed that defendant's subsequent conviction of manslaughter, on a record where "there was a real possibility that the jury could have found defendant not guilty," was suggestive of a possible compromise verdict. 71 *N. J.* at 69-71. Thus, the defendant was prejudiced by the instruction. The Court concluded that "[h]enceforth, it should be regarded as error for a trial judge to deliver a jury instruction on a criminal charge for which there is no, or insufficient evidence to support the instruction." *Id.* at 73.

We need not further discuss *Christener* in this case since it was a prospective holding rendered subsequent to the trial in this case. However, in the interest of clarifying

any misconceptions about that case, we shall address the issue.

Our holding in *Christener* does not stand for the proposition that reversal is mandated every time a judge charges a jury about a crime for which there may be insufficient evidence to support a conviction. The entire discussion of *Christener* centered on the prejudicial effect of "overcharging," or instructing the jury on a crime more serious than is warranted by the evidence. In this case, the mistaken charge was not an overcharge. Rather, it related to alternate theories of establishing the same offense—first degree murder. In fact, the killing of a non-policeman requires proof of a greater level of culpability for conviction than does the killing of a police officer acting in the line of duty. Since the additional elements of design and premeditation are required to sustain a first degree murder conviction for the killing of a non-policeman, any confusion on the part of the jury would redound to the benefit of the defendant, as only an intent to kill is required to support a first degree murder conviction when the victim is an on-duty policeman.

Whatever jury confusion existed in this case, it certainly was not bottomed on the issue of whether or not decedent was an on-duty police officer. Thus, we adopt the rule that the giving of an instruction that correctly states the law, but is inapplicable to the facts or issues before the court is error, but that prejudice must be shown in order to constitute it reversible error. *See State v. Anstine,* 91 *Idaho* 169, 418 *P.* 2d 210, 215 (1966); *People v. Van Eyk,* 56 *Cal.* 2d 471, 15 *Cal. Rptr.* 150, 364 *P.* 2d 326 (1961), *cert.* denied 369 *U. S.* 824, 82 *S. Ct.* 838, 7 *L. Ed.* 2d 788 (1961). In cases where as a result of improper undercharging or other circumstances a charge not based on the evidence can only redound to defendant's benefit, harmless error has been found. *See Stovall v. State,* 236 *Ga.* 840, 225 *S. E.* 2d 292 (1976); *Calvo v. State,* 313 *So.* 2d 39 (Fla. App. 1975); *People v. Salas,* 7 *Cal.* 3d

812, 103 *Cal. Rptr.* 431, 500 *P.* 2d 7 (1972), *cert.* den. 410 *U. S.* 939, 93 *S. Ct.* 1401, 35 *L. Ed.* 2d 605 (1972); *State v. Heald,* 292 *A.* 2d 200 (Me. 1972). This defendant was not prejudiced.

## V

We have examined the defendant's other contentions of error and find all of them to be without merit. Furthermore, we reaffirm the principle announced in *State v. Hampton,* 61 *N. J.* 250 (1972), that the trial judge is to be the sole arbiter of the voluntariness of a defendant's statement. We reject defendant's invitation to overrule that decision.

## VI

In light of the obvious confusion of the jury regarding the various statutes in question, we hold that it was reversible error for the judge to simply re-read *N. J. S. A.* 2A:113-2 in response to inquiries by the jury. A further explanation in conformance with *Madden* was required. While it is not our function to delve into the minds of jurors, given the fact that deliberations took more than a day and yet resulted in a conviction, there is certainly a strong likelihood that their main issue of discussion was defendant's degree of guilt. Thus the failure to stress the requirement that intent to kill was necessary for a first degree murder conviction was error capable of producing an unjust result and mandates reversal.

The misconduct of the prosecutor in his overly specific questioning of defendant concerning his past crimes is a further ground on which reversal might be based. When this is combined with the irrelevant but prejudicial questions asked defendant concerning his drug habit, reversal on the basis of these errors was a distinct possibility. However, we need not reach that issue since we have already concluded that reversal is in order on a different ground.

The conviction of defendant is reversed and the case is remanded for a new trial.

CLIFFORD, J., concurring. I join in the entirety of Justice Pashman's opinion for the Court, with the exception of the penultimate paragraph. In my view the prosecutorial misconduct in this case was sufficient standing alone to warrant reversal and I would so vote. See *State v. Kenny,* 68 *N. J.* 17, 32 (1975) (concurring opinion).

CLIFFORD, J., concurring in the result.

*For reversal and remandment*—Chief Justice HUGHES and Justices MOUNTAIN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—6.

*For affirmance*—None.