# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0256-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

O.P.-B.,

    Defendant-Appellant.

_____

Argued October 18, 2021 – Decided January 6, 2022

Before Judges Rothstadt and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 16-09-1503.

Carlos Diaz-Cobo argued the cause for appellant.

Steven K. Cuttonaro, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Steven K. Cuttonaro, of counsel and on the brief).

PER CURIAM

Defendant O.P.-B.[1] appeals from a September 13, 2019 judgment of conviction that the trial court entered after a jury found him guilty of two counts of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b), and one count of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1). The trial court sentenced defendant to an aggregate term of four years.

On appeal, defendant specifically argues the following points:

POINT I

THE TRIAL COURT ERRED IN REFUSING TO ANSWER THE JURY'S QUESTION DURING DELIBERATIONS WITH REGARDS TO THE LAW THAT PROVIDES THAT A VICTIM OF A CRIME INVOLVING SEXUAL ABUSE AND THEIR FAMILIES HAVE A PATHWAY TO CITIZENSHIP, DENYING [DEFENDANT] OF DUE PROCESS AND A FAIR TRIAL WHERE THAT VERY ISSUE WAS THE CRUX OF HIS DEFENSE. [RAISED BELOW].

POINT II

THE VERDICT OF GUILTY WAS NOT SUPPORTED BY THE EVIDENCE. [RAISED BELOW].

POINT III

THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE. [RAISED BELOW].

---

[1] We use initials and pseudonyms in reference to defendant, the victim, and the victim's family members to protect the privacy of the child victim. R. 1:38-3(c)(9).

A-0256-19

We affirm because we conclude that the trial court correctly instructed the jury without reference to federal immigration laws as there was no evidence presented at trial regarding any witness's pursuit or knowledge of a federal pathway to citizenship available to crime victims, and there was substantial evidence to support defendant's conviction, including the victim's testimony and DNA evidence. In addition, we find that defendant's argument regarding his sentence is without merit.

I.

The facts developed at defendant's trial are summarized as follows. Defendant's victim, then fourteen-year-old Amelia, came to the United States from Honduras in 2014 with her father as undocumented immigrants. In 2015, Amelia and her father lived in her cousin's home. At that time, her cousin was married to defendant, who also lived in the same house. Beginning in September 2015, defendant, who was then thirty-five-years old, began to abuse Amelia.

According to Amelia, there were four incidents of abuse. The first time that defendant sexually assaulted the child, he told her she could not tell anyone what was happening and that if she did, he would report her to immigration authorities and she and her father would be deported. The initial attack was followed by another on a different evening a few days later. During the first

incident, defendant assaulted Amelia by performing cunnilingus and digitally penetrating her vagina. During the next incident, defendant digitally penetrated her. The third time, defendant raped the child by penetrating her vagina with his penis. The fourth time, defendant threatened her again about calling immigration and forced her to perform fellatio.

After the last incident, Amelia was able to rub samples of defendant's semen on her underwear and pick up a napkin that defendant used to clean himself, without defendant seeing her do so. She put the clothing and napkin in a bag that she hid in her suitcase.

Later that week, Amelia disclosed the incidents to her grandmother and aunt, giving her aunt the bag with her clothing and the napkin. The aunt told her husband about what was happening to Amelia, and he told Amelia's father. Eventually Amelia's father told his boss about what had happened. The boss convinced the father to call the police.

Amelia's father also confronted defendant in his niece's presence. Defendant denied the allegations but also stated his wife always had an excuse not to engage in sexual relations with him.

A-0256-19

The police responded and brought Amelia to headquarters where she gave statements about what happened to her. Later, she underwent a physical examination.

Detective Jeffrey Monticello of the New Brunswick Police Department (NBPD) conducted Amelia's initial interview in the presence of her father, which was not recorded. After the interview, the detective contacted the Juvenile Aid Bureau, and turned the case over to that unit.

Detective Karla Capes and Detective Donald Heck of the Middlesex County Prosecutor's Office obtained another statement from Amelia without any family members being present. In her statement, Amelia stated that she was abused six or seven times, including the four times already described. She did not include any details, as she did later at trial, about her trying to push defendant off her, that he pulled down her pants before touching her vagina, that he put his hands down his own pants, and that he threatened her with calling immigration.[2]

During Amelia's physical examination by Dr. Gladibel Medina, Amelia stated defendant also penetrated her anally and showed her pornography, which she also did not include in her statement to police. After the physical

---

[2] The parties do not dispute that there were inconsistencies between Amelia's trial testimony and her earlier statement to police describing the incidents and the number of times the assaults occurred.

A-0256-19

examination, Dr. Medina concluded that Amelia did not display any physical signs of injury. The doctor believed that Amelia had been sexually abused based only upon the information Amelia provided, so if that information was incorrect, that would "curtail" the doctor's ability "to come to a conclusion with a reasonable degree of certainty."

After interviewing Amelia, Capes and Heck went to defendant's home that evening and examined Amelia's room. Capes also spoke with the aunt, who gave him the underwear, which she assumed belonged to Amelia, that "possibly had" defendant's semen on it.

As part of their investigation, the detectives also obtained a buccal swab from defendant to use in DNA tests. In February 2016, Heck received a notification from the Middlesex County Prosecutor's Office's DNA analyst that there was a positive hit for DNA on the underwear, but the analyst needed a buccal swab from Amelia for comparison purposes. Heck then collected a swab from Amelia. Later, as testified to by the DNA expert, it was determined that the DNA found on the napkin and clothing matched defendant's DNA. Thereafter, the police arrested defendant.

On September 22, 2016, a Middlesex County Grand Jury returned an indictment, charging defendant with the following crimes: two counts of

6

second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) and (c)(4); two counts of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b); one count of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1); and one count of third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(2).

After pre-trial hearings, defendant was tried over seven non-consecutive days in May 2019. During the trial, after the State rested, defense counsel moved for a judgment of acquittal, arguing that the State did not present sufficient evidence to convict defendant. The trial court denied the motion, reasoning that if Amelia was believed by the jury, there was "certainly sufficient evidence" of the crimes charged, including the DNA evidence.

After defendant rested, the trial court conducted a charge conference. Neither the prosecutor nor defense counsel objected to any of the proposed jury charges or the verdict sheet. One of the charges dealt with Amelia's and her father's immigration status. In that charge, the trial court instructed that the jury could consider whether "the possibility that the State may help [Amelia and her father] delay or avoid removal from the United States improperly influence their testimony."

During the ensuing jury deliberations, the jury sent a note to the trial court asking five questions, one dealing with whether a crime victim's "path to

citizenship," was limited to the victim or also included her family. After conferring with counsel, the court responded to the jury that "[t]here was no description of the [federal] law as to a path to citizenship presented to you by any witness or the [c]ourt during the trial." It continued, "[i]f you want me to play back any portions of the testimony relating to this issue, I can do that for you, but you need to request . . . what testimony you want to hear."

On May 29, 2019, the jury returned its verdict. The jury could not reach a verdict on both counts of sexual assault and one count of hindering apprehension. It found defendant guilty of two counts of criminal sexual contact and one count of endangering the welfare of a child. The trial court accepted the partial verdict. After the trial, the State informed the trial court that it decided to dismiss the three counts on which the jury could not reach a verdict and the court entered an order dismissing those counts the same day.

On September 13, 2019, the trial court sentenced defendant to four years imprisonment. This appeal followed.

## II.

We begin our review by addressing defendant's contention that the jury instruction and the court's response to the jury's question about its consideration of the witnesses' immigration status were insufficient. According to defendant,

8

the trial court gave the jury "an incomplete jury instruction as to '[C]redibility-Immigration [C]onsequences,'" and it failed to provide the "necessary law" to the jurors when they asked for clarification. We disagree.

A.

During the trial, no witnesses testified that they were aware of any federal law that provided for an easier pathway towards citizenship if they cooperated with the prosecutor in a criminal case and testified for the State at a trial.[3] The only time the issue arose, was during the cross-examination of Amelia's father.

---

[3] The federal law being addressed was 8 U.S.C. § 1101(a)(15)(U). Under this section of the statute, which provides for what is known as a "U Visa." Ibid. It allows "[an] alien [who] has suffered substantial physical or mental abuse as a result of having been the victim of criminal activity," to receive temporary immigration status and the possibility of lawful permanent resident status. 8 U.S.C. § 1101(a)(15)(U)(i)(I). To qualify, a non-citizen must submit a form that includes the certification of a law enforcement official, who must detail the crime and the assistance the non-citizen provided in the prosecution of that crime. U.S. Dep't of Homeland Sec., U Visa Law Enforcement Certification Resource Guide for Federal, State, Local, Tribal and Territorial Law Enforcement at 2, https://www.dhs.gov/xlibrary/assets/dhs_u_visa_certification_guide.pdf (last visited Dec. 28, 2021). The form does not by itself grant any immigration benefit. Id. at 4. If the application is approved, temporary immigration status can also be granted for qualifying family members. Id. at 5. The non-citizen must be "helpful in the detection or investigation" of the crime; testifying is not required, but if asked to testify, the non-citizen cannot "unreasonably refuse to cooperate with law enforcement." Id. at 1, 11.

A-0256-19

On direct, Amelia's father testified that he came to the United States to work in order to save money to buy property in Honduras and to pay for his daughter's education. He explained that his intention was to return to Honduras with Amelia to reunite with his wife and other children.

During cross-examination, defense counsel asked Amelia's father whether he was aware "that you can get your documents and stay here legally if you testify as a victim in a criminal case?" The State objected. During the ensuing sidebar conference, the parties disagreed over the immigration law, defense counsel suggested he could rephrase the question, and the State requested a curative instruction. The court then explained to the jury that "there are multiple ways to gain legal residency in the United States. Testimony in a criminal trial is not a requirement for gaining legal residency in the United States." Defense counsel then asked Amelia's father if he was "aware . . . that if you [are] a victim of a crime that you can gain legal residency here in the United States?" The father replied that he was not aware of that law and did not know that. [4]

_____

[4] Defense counsel never asked Amelia if she was aware of the law. She testified that she wanted to stay here for college, and become a police officer, but nothing about becoming a citizen through U Visa or otherwise. Defendant attempted to create an inference that Amelia knew about the federal law through the testimony of his wife. His wife testified that Amelia spent most of her time in her room, but she would come down for dinner and to watch a Spanish television

10

Later, during the charge conference, as already noted, defendant never raised any objection to the trial court's proposed instructions to the jury. As to the charge about the witnesses' immigration status, the court confirmed that "both attorneys wanted [the trial court] to take out" language that was contained as an option in the Model Jury Charge about how the jurors may consider a witnesses' immigration status during their deliberations.[5] As the court described,

show with her that was about "a lot of different things" including "all the ways that a person could get documentation in this [c]ountry, family fights, [and] robberies."

[5] The paragraph is contained in Model Jury Charge (Criminal) "Credibility— Immigration Consequences of Testimony" (rev. June 6, 2016) and states the following:

> You have also heard evidence that [witness(es) may [have applied for] [be interested in] [be aware of] programs that could prevent removal if the State informs federal immigration authorities that [he/she/they] [was/were] a victim of a crime. This evidence may be used by you in assessing the credibility or believability of [name of witness(es)] testimony. However, [names of witness(es)] [application for] [knowledge of] [interest in] [awareness of] such a program may be used only to the extent you determine that it has biased [name of witness(es)] in favor of the State, that is to say, if you believe that [name of witness(es)] testified as [he/she/they] did because of the potential threat of

> the second paragraph . . . has nothing to do with this case. It's talking about people applying for programs and you have also heard testimony that such and such may have applied or been interested in a program that could prevent removal, et cetera. And both attorneys agreed that language didn't apply to our case.

After summations, the court delivered its instructions, which mirrored the Model Jury Charge, except for the omitted paragraph noted above. In it, the court specifically reminded jurors that they "heard evidence . . . that [Amelia and her father,] . . . are foreign nationals who are not legal residents of the United States and, therefore, subject to removal from the country." It also instructed that although the witnesses were "here in violation of federal immigration laws[, that did] not, in and of itself, affect their credibility or believability. Rather, the focus must be on whether the possibility that the State may help [Amelia and her father] delay or avoid removal from the United States improperly influence their testimony." The charge instructed the jurors that they could consider "whether . . . testimony was influenced by the hope or expectation for any favorable treatment or reward such as delaying or avoiding

---

> removal, and because [he/she/they] hoped that [his/her/their] testimony would help [him/ her/them] to avoid removal from this country.
>
> [Id. (alterations in original).]

removal from the United States by federal immigration authorities." (Emphasis added).

As already noted, the jury later submitted a question to the trial court about the immigration issue, asking "[i]s being a victim of a crime a path to citizenship for who; the family or just the victim?" In discussing the potential answers to this question with the court, the State's position was that it would be erroneous for the jury to consider the federal law, as there was no agreement between the State and Amelia, and there was no evidence that there was any type of special treatment given, promised, or even considered.

In response, defense counsel noted that the State submitted voir dire questions related to illegal immigrants, that they presented Amelia's father's testimony and brought out evidence regarding how he and Amelia came to the United States illegally, and the defense presented a motive to lie defense. He acknowledged that Amelia's father denied knowing about the pathway to citizenship but argued that did not foreclose the defense from raising the argument because it would affect their credibility and was the "crux" of the defense. He also argued that the law did not require them to have an agreement during trial, and the federal government could evaluate whether they complied afterwards, so the non-existence of an agreement between Amelia and the State

13

was not dispositive. However, defense counsel also conceded that during the charge conference, the parties agreed that the section about a witness applying for a U Visa, or being interested in applying should be removed and that he had no objection at the time.

According to the court, the jury's question involved a topic that was not addressed during the trial—there was no witness that testified about the law, and there was no support in the record about whether Amelia or her father knew about the law, pursued it, or had plans to pursue it in the future. The court also explained that it does not "answer jury's questions by bringing extraneous information, whether they[ have] asked for it or not." Moreover, the court noted that when defense counsel asked Amelia's father about the federal immigration law, he testified he did not know anything about the law and that it was his plan to go back to Honduras. The court also highlighted that defense counsel set forth a motive to lie defense and that defendant got the benefit of that argument, but it was "not going to now start talking to the jury about a law that's not in the case, that nobody testified to, that[] there's no support . . . for."

The trial court proposed that it would tell the jury "something along the lines of" explaining that "the law as to citizenship was . . . not . . . presented to you, or not part of the testimony or evidence in this case," and that there were

14

some questions asked during trial about the immigration law and she could play back the testimony for the jury if they requested it. Defense counsel said he would "object to any answer to the jury's question that says that there was nothing presented or that there was no evidence with respect to this, because there was," and that it was a mistake for him to have agreed during the charge conference that the paragraph of instructions on federal immigration law should not be given to the jury.

As already noted, the trial court thereafter answered the jury's question, by advising the jury that neither the court nor any witnesses discussed "a path to citizenship," and "[i]f you want me to play back any portions of the testimony relating to this issue, I can do that for you, but you need to request [the] testimony you want to hear." The jury never requested that the testimony be replayed.

### B.

Our standard of review of jury charges is well settled. "[A]ppropriate and proper [jury] charges are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). We must give "careful attention" to jury instructions. State v. Montalvo, 229 N.J. 300, 320 (2017). "They 'must provide a "comprehensible explanation of the

15

questions that the jury must determine, including the law of the case applicable to the facts that the jury may find."'" Ibid. (quoting State v. Singleton, 211 N.J. 157, 181-82 (2012)).

A "court has an 'independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party.'" Baum, 224 N.J. at 159 (alteration in original) (quoting Reddish, 181 N.J. at 613). Where a trial court follows a model jury charge, we typically afford the instruction given a "presumption of propriety." Estate of Kotsovska v. Liebman, 221 N.J. 568, 596 (2015).

"Because proper jury instructions are essential to a fair trial, 'erroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the defendant." Baum, 224 N.J. at 159 (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)). However, "[w]ithout an objection at the time a jury instruction is given, there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." Montalvo, 229 N.J. at 321 (emphasis added); see also State v. Funderburg, 225 N.J. 66, 79 (2016) (explaining that the time to object to a jury instruction is before the jury deliberates). Indeed, failure

to object to a jury instruction "is considered a waiver to object to the instruction on appeal." State v. Maloney, 216 N.J. 91, 104 (2013).

When a defendant fails to object to an error regarding jury charges, we review for plain error. Montalvo, 229 N.J. at 320-21 (citing R. 1:7-2); see also Funderburg, 225 N.J. at 79. "Under that standard, we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). "The mere possibility of an unjust result is not enough. To warrant reversal. . . , an error at trial must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (alteration in original) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

In the context of jury instructions, "plain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)). In deciding that issue, we "read [the instruction] as a whole in determining whether there was any error." State v. Torres, 183 N.J. 554, 564 (2005). Moreover, the effect of any error

17

must be considered "in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting Chapland, 187 N.J. at 289).

We review a trial court's response to a jury question in a similar fashion. "It is firmly established that '[w]hen a jury requests a clarification,' the trial court 'is obligated to clear the confusion.'" State v. Savage, 172 N.J. 374, 394 (2002) (alteration in original) (quoting State v. Conway, 193 N.J. Super. 133, 157 (App. Div. 1984)). If the jury's question is ambiguous, "the judge is obligated to clear the confusion by asking the jury the meaning of its request." State v. Graham, 285 N.J. Super. 337, 342 (App. Div. 1995). Whether, after consulting with counsel, a trial court's response to a jury question is adequate can be inferred from the jury not asking any additional related questions or seeking further clarification. See State v. McClain, 248 N.J. Super. 409, 421 (App. Div. 1991) (emphasizing that the jury's failure "to ask for further clarification or indicate confusion demonstrates that the response was satisfactory"); State v. Morgan, 423 N.J. Super. 453, 469-70 (App. Div. 2011) (presuming a judge's response to a jury question is proper when the judge consults with counsel before responding), aff'd, 217 N.J. 1 (2013).

In our review, we determine whether the trial court "erred in its response and, if so, whether that 'error undermines our confidence that the deliberative

18

process produced a just result and the conviction must be reversed.'" State v. Lykes, 192 N.J. 519, 537 (2007) (quoting State v. Parsons, 270 N.J. Super. 213, 224-25 (App. Div. 1994)).

In formulating either its instructions or a response to a jury question, it is "fundamental to the assurance of a fair trial, that the trial court ensure that jury deliberations are based solely on, the evidence and in accordance with proper and adequate jury instructions." State v. Josephs, 174 N.J. 44, 91 (2002). Jury instructions must be supported by the evidence in the record. State v. Christener, 71 N.J. 55, 69 (1976), abrogated on other grounds by State v. Wilder, 193 N.J. 398, 407 (2008). "[T]he giving of an instruction that correctly states the law, but is inapplicable to the facts or issues before the court is error." State v. Thomas, 76 N.J. 344, 365 (1978).

Applying these guiding principles to defendant's arguments, we conclude that the trial court did not err, either in the instructions it delivered to the jury or in its response to the jury's questions. First, as conceded by defendant, he did not object to the trial court not charging the jury about the federal law. Second, it is undisputed that the court's instruction about the jury's consideration of Amelia's and her father's immigration followed the Model Jury Charge and instructed that the jury could consider whether it was influenced by any promises

made regarding their immigration status. Third, after the court responded to the jury's question it did not ask any follow up questions or otherwise seek further clarification about the immigration status charge.

Last, but most significant, as the trial court observed, there was no evidence adduced at trial that either Amelia or her father knew anything about the possible availability of a U Visa. The only evidence in the case about Amelia's and her father's plans was that the father intended to go back to Honduras, not seek citizenship here, and Amelia wanted to go to college here and become a police officer. Under these circumstances, the trial court would have erred if it instructed the jury about the federal law. See Lesniak v. Cnty. of Bergen, 117 N.J. 12 (1989) ("A jury instruction that has no basis in the evidence is insupportable, as it tends to mislead the jury.").

## III.

We next consider defendant's contention that the trial court erred by denying his Rule 3:18-1 motion for a judgment of acquittal at the end of the State's case.[6] His only contention in this regard, without further explanation, is

---

[6] In support of his argument, defendant contends that the denial of his motion was tantamount to the denial of a motion for judgment notwithstanding the jury's verdict (JNOV) under Rule 3:18-2, which he never made. For our purposes, as explained infra, the failure to file the post-verdict motion does not make any

that "there was insufficient evidence, based on the incredible and inconsistent evidence provided by [Amelia] that he committed the sexual abuse crimes as a matter of law." As already noted, the trial court denied the motion based not only on Amelia's testimony but also the DNA tests results from Amelia's underwear that confirmed that article of clothing and the napkin she retrieved contained defendant's DNA. We agree with the trial court's conclusion.

A motion for judgment of acquittal is governed by Rule 3:18-1, and a motion for JNOV is governed by Rule 3:18-2. Trial courts apply the same standard under either rule and must consider

> whether the evidence viewed in its entirety, and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom, is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.

difference to our decision. Notably, defendant also failed to file a motion for a new trial under Rule 3:20-1, the denial of which is a prerequisite to arguing on appeal that the weight of the evidence was insufficient to support the verdict, as defendant now argues before us. See R. 2:10-1. Even if he had, we find no "'miscarriage of justice under the law,' R. 2:10-1, because the 'trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present.'" State v. Herrera, 385 N.J. Super. 486, 492 (App. Div. 2006) (quoting State v. Smith, 262 N.J. Super. 487, 512 (App. Div. 1993)).

> [State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011) (quoting State v. D.A., 191 N.J. 158, 163 (2007)).]

Thus, the question is whether the entirety of the evidence was sufficient, giving the State the benefit of all legitimate inferences, to find beyond a reasonable doubt that the defendant was guilty. See State v. Lodzinksi, ___ N.J. ___, __ (2021) (slip op. at 39). We apply that standard when reviewing de novo the trial court's decision. Ibid. "We assess the sufficiency in the record anew, and therefore we owe no deference to the findings of . . . the trial court." Ibid.

We conclude that, in this case, the evidence was sufficient to sustain the jury's verdict. We therefore conclude the court did not err by denying defendant's motions for a judgment of acquittal, substantially for the reasons stated by the trial court. We only emphasize that as the trial court mentioned, the presence of defendant's DNA on the child's underwear provided more than adequate corroboration of Amelia's testimony especially when "giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which can reasonably be drawn therefrom." Id. at __ (slip op at 39).

IV.

Finally, we consider defendant's challenge to his sentence. Defendant challenges only the court's consideration of mitigating factors under N.J.S.A.

2C:44-1(b), and its conclusion that the presumption against incarceration for third and fourth-degree crimes had been rebutted. According to defendant, the trial court "failed to take into account [his] arguments for mitigating factors other than [seven], despite the fact that there were over a dozen letters in support of [defendant's] character" and other mitigating factors presented and argued at sentencing. He also argues that the judge "failed to understand" that defendant was convicted of third and fourth-degree crimes and "enjoyed the presumption" of non-incarceration. We disagree.

A.

At sentencing, after considering counsels' presentencing submissions and oral arguments, the trial court found the circumstances of defendant's case was "very disturbing" because "defendant preyed upon a [fourteen-year-old] girl who was a guest in his home." It found applicable aggravating factors two, the gravity and seriousness of the harm inflicted, N.J.S.A. 2C:44-1(a)(2), three, the risk that defendant would commit another offense, N.J.S.A. 2C:44-1(a)(3), and nine, the need for deterring defendant and others, N.J.S.A. 2C:44-1(a)(9). The court explained its reasons for each of those factors. The court rejected the State's argument for application of aggravating factor four, N.J.S.A. 2C:44-1(a)(4), defendant took advantage of a position of trust or confidence to commit

23

the offense, because the court agreed with the defense that its application would be double counting.

Addressing the mitigating factors, the court concluded that defendant was entitled to mitigating factor seven, that defendant had no prior criminal history, N.J.S.A. 2C:44-1(b)(7). As to factor eight, that his conduct was the result of circumstances unlikely to recur, N.J.S.A. 2C:44-1(b)(8), and mitigating factor nine, the character and the attitude of the defendant, N.J.S.A. 2C:44-1(b)(9), the court found that defendant had not accepted responsibility for his actions and as a result is "not willing to do anything to change or learn from what he has been convicted of," as such, it was "hard for the [c]ourt to see how those factors would apply." The court acknowledged defendant's positive attributes described in the letters as true but explained that they "were also true at the time that he engaged in this conduct," and that those attributes did not stop him from abusing Amelia, so those factors did not apply.

The court rejected application of mitigating factor ten, that defendant would be particularly likely to respond affirmatively to probationary treatment, N.J.S.A. 2C:44-1(b)(10), because defendant could not be sentenced to probation, as he would be on parole supervision for life. As to factor eleven, N.J.S.A. 2C:44-1(b)(11), that the imprisonment would entail an excessive

24

hardship to himself or his dependents, the court found that it applied, but noted it was of slight weight.

The court then turned to the presumption against imprisonment that existed because defendant was not convicted of a first- or second-degree crime, and had no prior convictions. In doing so, it recognized that defendant was facing other consequences, such as losing his nursing license and being on parole supervision for life, and it considered the letters written on his behalf, but also took into consideration the fact that defendant, a man who Amelia and her father trusted, took advantage of that trust, and abused a "young [fourteen-]year[-]old victim, who was not in [any way] sophisticated or experienced sexually." The court ultimately concluded, under N.J.S.A. 2C:44-1(e)[7] and State

---

[7] N.J.S.A. 2C:44-1(e) reads:

> The court shall deal with a person convicted of an offense other than a crime of the first or second-degree, who has not previously been convicted of an offense, without imposing a sentence of imprisonment unless, having regard to the nature and circumstances of the offense and the history, character, and condition of the defendant, it is of the opinion that imprisonment is necessary for the protection of the public under the criteria set forth in subsection a. of this section.

v. Roth, 95 N.J. 334 (1984), that defendant must be imprisoned for the protection of the public.

Based on those findings, the court sentenced defendant on the third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a), to four years imprisonment, and to concurrent twelve-month sentences each for the two counts of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3.

## B.

Our "review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). In our review, we are "guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). Under that standard, we will affirm a sentence "unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting Roth, 95 N.J. at 364-65). In making that determination, we will not "'substitute [our] assessment of aggravating and mitigating factors' for the trial court's judgment," but "'assess the aggravating and mitigating factors to determine whether they were based upon competent credible evidence in the record.'" Miller, 205 N.J.

A-0256-19

at 127 (quoting State v. Bieneik, 200 N.J. 601, 608 (2010)). In doing so, we afford the trial court more discretion in its determination about the application of mitigating factors than the aggravating factors. State v. Blackmon, 202 N.J. 283, 297 (2010).

Applying that deferential standard, we conclude the sentence imposed here was not the result of an abuse of discretion, nor does it shock our judicial conscience. There is nothing in the record to support defendant's contentions that the trial court only considered his arguments as to mitigating factor seven, as it clearly reflects the court considered factors eight, nine, ten, and eleven as well. And, its determinations were supported by the evidence in the record.

As to the presumption of non-incarceration, defendant's argument that the trial court did not understand the presumption is similarly belied by the record. The trial court specifically recognized that in sentencing for crimes of the third- or fourth-degree, there exists a presumption of non-imprisonment if the defendant previously has not been convicted of an offense. N.J.S.A. 2C:44-1(e).[8] However, the trial court properly found that the presumption was

---

[8] The statute states the following:

> The court shall deal with a person convicted of an offense other than a crime of the first or second-degree,

overcome by its findings about the nature of the crime committed and that a prison term was necessary for the protection of the public. Ibid.; see also State v. Gardner, 113 N.J. 510, 517 (1989) ("[T]he presumption can be overcome only by a conclusion that [a defendant's] 'imprisonment is necessary for the protection of the public under the criteria set forth' in N.J.S.A. 2C:44-1(a), with additional reference to the 'nature and circumstances of the offense and the history, character and condition of the defendant.'" (quoting N.J.S.A. 2C:44-1(a))).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

who has not previously been convicted of an offense, without imposing a sentence of imprisonment unless, having regard to the nature and circumstances of the offense and the history, character, and condition of the defendant, it is of the opinion that imprisonment is necessary for the protection of the public under the criteria set forth in subsection a. of this section.

A-0256-19